972 P.2d 1081

Tracy Alicia RUF, individually and as Special Administratrix of the Estate of Aleisea Kuuipo Tua Lani Maliateza Woolsey–Ruf, and Dathaniel T. Woolsey, Plaintiffs–Appellants,

v.

HONOLULU POLICE DEPARTMENT and City and County of Honolulu, Defendants–appellees, and Aaron Christopher Schonlau and Todd Lee Schonlau, Defendants

No. 21255

Supreme Court of Hawai'i.

Feb. 23, 1999.

Reconsideration Denied March 15, 1999.

Joseph P.H. Ahuna, Jr., and John H.W. Yuen (of the Law Offices of Joseph P.H. Ahuna, Jr.), on the briefs, for plaintiffs-appellants Tracy Alicia Ruf, individually and as special administratrix of the Estate of Aleisea Kuuipo Tua Lani Maliateza Woolsey–Ruf, and Dathaniel T. Woolsey.

Edwin C. Nacino, Deputy Corporation Counsel, on the briefs, for defendants-appellees Honolulu Police Department and the City and County of Honolulu.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiffs-appellants Tracy Alicia Ruf, individually and as special adminstratrix of the Estate of Aleisea Kuuipo Tua Lani Maliateza Woolsey–Ruf (hereinafter, Aleisea), and Dathaniel T. Woolsey (collectively, the plaintiffs) appeal from the orders of the fifth circuit court (1) denying the plaintiffs' motion for leave to file a second amended complaint and (2) granting the defendants-appellees Honolulu Police Department and the City and County of Honolulu's (collectively, "the HPD") motion to dismiss the first amended complaint.[1] On appeal, the plaintiffs argue that the circuit court: (1) erred in granting the HPD's motion to dismiss the first amended complaint because (a) it should have (i) treated the motion as a motion for summary judgment and (ii) ruled that the HPD had failed to meet its burden of showing that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law, and (b) the first amended complaint alleged sufficient facts to state a claim against the HPD for which relief could be granted; and (2) abused its discretion in denying the plaintiffs' motion to file a second amended complaint. The plaintiffs' initial argument that the "motion to dismiss" should have been treated as a motion for summary judgment is without merit. Moreover, for the reasons discussed below, we do not agree that the plaintiffs' complaint—in any of its amended forms, filed or proffered to date—states a claim against the HPD for which relief can be granted. Accordingly, it is unnecessary to address the plaintiffs' last argument that the circuit court abused its discretion in denying the plaintiffs' motion to file a second amended complaint. We therefore affirm the circuit court's orders and judgment.

---

1. The plaintiffs also purport to appeal from the circuit court's order granting the HPD's motion to dismiss the original complaint. However, they do not raise any arguments pertaining to that order in (1) the statement of questions presented, (2) the statement of points of error on appeal, or (3) the argument section of their opening brief. Instead, they address the issue solely in a single footnote in the fact section of the opening brief. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (1995) provides in relevant part that an appellant must provide a "concise statement of the points on which appel-

lant intends to rely" and that "[p]oints not presented in accordance with this section will be disregarded, except that the court, at its option, may notice a plain error not presented." See also HRAP Rule 28(b)(6) (requiring a statement of questions presented). We see no reason to delve into an inquiry whether the circuit court's order was plain error, inasmuch as the circuit court allowed the plaintiffs to file a first amended complaint. See infra section I. Although the circuit court's approach seems to be unusual, we cannot discern any prejudice to the plaintiffs resulting from it.

## I. BACKGROUND

On July 25, 1995, the plaintiffs filed a complaint in the fifth circuit court against the HPD, Aaron Christopher Schonlau (hereinafter, Aaron), and Todd Lee Schonlau (hereinafter, Todd), alleging in relevant part as follows:

... On or about July 27, 1993, [Aaron] intentionally, wilfully, and wantonly abducted, sexually assaulted, raped and murdered a four year old girl named [Aleisea] at Anini Beach, County of Kauai, State of Hawaii (hereinafter the "incident").

... At the time of this incident, [Aaron] had a criminal record and history of serious crimes, and was an escaped felon who was wanted in the State of Colorado for burglary and escape. [Aaron] was listed as a wanted felon in the National Crime Information Center's (hereinafter "NCIC") computer network.

. . . .

... On or about June 25, 1993, a woman filed a complaint with [the HPD] reporting that [Aaron] had entered her tent and attempted to rape her in the early morning of June 25, 1993 at a camping ground near Punalu['ju, in the City and County of Honolulu, Hawai['ji. Thereafter [the HPD] arrested [Aaron]·for burglary and sexual assault at the camping ground ... and held him in their control and custody for several hours. [The HPD] released [Aaron] later that same day because they could not find the complainant and the NCIC computer check indicated that [Aaron] was *not* on the "wanted" list.

... After the July 27, 1993 incident, the Kauai Police Department discovered through the NCIC that [Aaron] was wanted for burglary and escape in the State of Colorado.

... [The HPD] did not discover that [Aaron] was wanted for burglary and escape in the State of Colorado on June 25, 1993 because [the HPD] had entered the wrong spelling of [Aaron's] name and the wrong social security number into the NCIC computer when they had him in custody and control on June 25, 1993.

... [The HPD] owed a duty of reasonable care to protect individuals such as [Aleisea] from a dangerous person such as [Aaron] when such dangerous person was under arrest and in their custody and control. A special relationship between [the HPD] and the [plaintiffs] was created and, thus[,] a duty of reasonable care to the [plaintiffs], when [the HPD] could reasonably foresee that they would be expected to take affirmative and proper actions to protect the public and individuals such as [Aleisea], and that harm, even harm and death to individuals such as [Aleisea], would result if they failed to do so.

... [The HPD] knew or should have known that [Aaron] would cause bodily harm to others, even harm and death to [Aleisea,] if [Aaron] was not kept in [its] custody and control, and thus, owed a duty to exercise reasonable care to keep in their custody and/or control [Aaron] to prevent him from doing harm to others, even injury and death to [Aleisea].

... The incident ... was directly and proximately caused by the negligent ... acts and omissions of [the HPD.]

(Emphasis in original.) The complaint further alleged that Todd (1) was Aaron's natural brother, (2) knew of Aaron's criminal history and violent proclivities, and (3) failed to reasonably restrain him in order to prevent Aleisea's death. The plaintiffs prayed for damages, *inter alia,* for wrongful death, pain and suffering, emotional distress, and loss of love and affection.

The HPD filed an answer to the complaint and a cross-claim against Aaron and Todd on August 25, 1995. Aaron and Todd apparently failed to make an appearance in the case. On June 26, 1997, the HPD filed a "notice of dismissal without prejudice" of its claims against Aaron and Todd. On the plaintiffs' motion, default judgment was entered against Aaron and Todd and in favor of the plaintiffs on January 12, 1998. Neither Aaron nor Todd made an appearance in the present appeal.

On March 20, 1997, the HPD filed a motion to dismiss the complaint, arguing that the plaintiffs had failed to allege sufficient facts to support their claim of a special relationship between the HPD and the plaintiffs, and

that, consequently, the HPD owed them no duty. In response, on March 25, 1997, the plaintiffs filed a motion for leave to amend their complaint. In the memorandum in support of their motion, the plaintiffs alleged that they had learned at some unspecified time "through discovery" that, "during the HPD interrogation of [Aaron] on June 25, 1993, [Aaron] had confessed to burglary and attempted rape of the complainant woman. Despite this confession, [the] HPD negligently released [Aaron]." Although the plaintiffs asserted that they "f[elt] there [were] sufficient facts to support a claim for negligent release" in the original complaint, they prayed leave of the court to amend it in order to add allegations regarding the confession. On April 2, 1997, the plaintiffs filed a memorandum in response to the HPD's motion to dismiss, arguing that the complaint alleged sufficient facts to state a claim pursuant to the Restatement (Second) of Torts (hereinafter, Restatement (Second)) § 319 (1965).

Following a hearing conducted on April 10, 1997, the circuit court orally granted the HPD's motion to dismiss the original complaint, but also granted the plaintiffs' motion to file an amended complaint. As the court explained to the HPD's counsel, "I'm granting your dismissal . . . as to your motion. But . . . I'm permitting the amendment first. So your dismissal goes to the . . . complaint as filed." The circuit court invited the HPD to file a new motion to dismiss with respect to the amended complaint, if the HPD believed it would be appropriate to do so. The circuit court's written orders granting the plaintiffs' motion to amend the complaint and the HPD's motion to dismiss the original complaint were filed on April 24, 1997 and June 13, 1997, respectively.

The plaintiffs filed their first amended complaint on April 14, 1997, incorporating the allegations regarding Aaron's confession as described above. The HPD filed an answer to the first amended complaint on May 8, 1997. On June 3, 1997, the HPD filed a motion, denominated "motion to dismiss with prejudice plaintiffs' first amended complaint," substantially reiterating the arguments advanced in its first motion to dismiss.

The HPD's memorandum in support of its motion included the following:

For the purposes of this motion only, the facts alleged in Plaintiffs' First Amended Complaint . . . as well as the following facts are undisputed: On June 25, 1993, at approximately 2:00 a.m., Aaron . . . was arrested by the Honolulu Police Department ("HPD") for the criminal offenses of Burglary and Attempted Sex Assault. The appropriate local and National Crime Index Computer ("NCIC") checks of [Aaron] were performed by the [HPD]. However, outstanding arrest warrants issued by the State of Colorado were not discovered[, and] therefore[,] not served on [Aaron]. The alleged victim of the attempted sex assault and burglary failed to appear at the police station at the scheduled time to pick [Aaron] from a live line-up in order to fulfill the element of identification and could not be physically located. On June 25, 1993, at approximately 3:00 p.m., the investigating detective, facing federal and state constitutional constraints under *Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), conferred with prosecutors and it was decided to release Schonlau from police custody pending further investigation.

On July 27, 1993, on the Island of Kauai, [Aaron] was arrested and convicted for the rape and murder of Aleisea . . . at Anini Beach Park. [The plaintiffs] subsequently filed the instant First Amended Complaint[.]

The sole attachments to the HPD's motion and supporting memorandum were a copy of the plaintiff's first amended complaint and an affidavit attesting to the complaint's authenticity.

In response, on June 6, 1997, the plaintiffs filed a motion for leave to file a second amended complaint. In their memorandum in support of the motion, the plaintiffs explained that, in response to the HPD's motion to dismiss, they wished to amend their complaint "to clarify that Plaintiffs are stating a claim under [Restatement (Second) § ] 319." The plaintiffs' proposed amendments included the following additional language:

[The] HPD had taken charge of, arrested and held in [its] custody and control [Aaron,] who [the] HPD knew or should have known, by the June 25, 1993 confession and the nature and facts of the sexual offense, that [Aaron] was likely to cause bodily harm to others, including harm and death to [Aleisea] if not controlled. [The] HPD is under a duty to exercise reasonable care to control [Aaron] to prevent him from doing such harm (see [Restatement § 319] and related comments and Sections). Thus, a special relationship was created between [the] HPD and [Aaron] by [the] HPD's affirmative acts of taking charge of, arresting, and holding in [its] custody and control a confessed dangerous sexual offender such as [Aaron,] whom [the] HPD knew or should know to be likely to cause bodily harm to others, including individuals such as [Aleisea,] if not controlled, and owed a duty to exercise reasonable care to control [Aaron] to prevent him from doing such harm.

(Emphasis in original deleted.)

On June 16, 1997, the plaintiffs filed a memorandum in opposition to the HPD's motion to dismiss the first amended complaint, arguing, *inter alia*, that the motion should be treated as a motion for summary judgment because the HPD had allegedly made reference to facts outside the pleadings.

Following a hearing on the motions conducted on June 23, 1997, the circuit court ruled orally as follows:

> THE COURT: The Court is going to deny plaintiff[ ]s['] motion for leave to amend the complaint. And the reason for this is ... because the Court is going to grant [the] HPD's motion to dismiss. And even had the Court permitted the amendment, the Court would still have entertained and granted the motion to dismiss.

The circuit court's orders denying the plaintiffs' motion for leave to amend and granting the HPD's motion to dismiss the first amended complaint were filed on July 22, 1997. The circuit court's final judgment in favor of the HPD and against the plaintiffs, certified pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) (1996), was filed on December 5, 1997. The plaintiffs timely appealed the judgment on December 31, 1997.

## II. STANDARDS OF REVIEW

### A. Motions For Judgment On The Pleadings

■ As discussed *infra* in section III.A, the HPD's June 3, 1997 motion, albeit denominated a motion to dismiss the first amended complaint, should be treated as a motion for judgment on the pleadings pursuant to HRCP Rule 12(c) (1996).

In a motion for judgment on the pleadings under HRCP Rule 12(c), "the movant [must] clearly establish[ ] that no material issue of fact remains to be resolved and that he [or she] is entitled to judgment as a matter of law." 5A C. Wright & A. Miller, *Federal Practice and Procedure: Civil (Federal Practice)* § 1368, at 518 (2d ed.1990). "In considering a motion for judgment on the pleadings, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* at 518–19.

> [O]ur task on appeal is to determine whether the circuit court's order ... supports its conclusion that [the movant] is entitled to judgment as a matter of law and, by implication, that it appears beyond [a] doubt that the [nonmoving party] can prove no set of facts in support of [its] claim that would entitle [it] to relief under any alternative theory.

*Baehr v. Lewin,* 74 Haw. 530, 550, 852 P.2d 44, 54, *reconsideration granted and clarification granted in part,* 74 Haw. 650, 875 P.2d 225 (1993) (citations omitted). On appeal, we review *de novo* the trial court's order granting the [m]otion. *Alexander v. City of Chicago,* 994 F.2d 333, 335 (7th Cir.1993). *See Kruzits v. Okuma Mach. Tool, Inc.,* 40 F.3d 52, 54 (3d Cir.1994) (reviewing court exercises "plenary review" over district court order granting Fed.R.Civ.P. 12(c) motion for judgment on the pleadings).

*Mendes v. Heirs and/or Devisees of T. Kealakai,* 81 Hawai'i 165, 168, 914 P.2d 558, 561 (App.1996) (brackets in original).

### B. *The Existence Of A Duty*

 ... The existence of a duty, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant—is entirely a question of law. *Bidar[ v. Amfac, Inc.],* 66 Haw. 547, 552, 669 P.2d [154,] 158 [ (1983) ] (citing W. Prosser, *Handbook of the Law of Torts* § 37, at 206 (4th ed.1971)).

*Tabieros v. Clark Equip. Co.,* 85 Hawai'i 336, 353, 944 P.2d 1279, 1296 (1997) (quoting *Birmingham v. Fodor's Travel Publications, Inc.,* 73 Haw. 359, 366, 833 P.2d 70, 74–75 (1992)).

We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citation omitted).

*Roxas v. Marcos,* 89 Hawai'i 91, 115, 969 P.2d 1209, 1233 (1998) (quoting *State v. Kane,* 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *Aickin v. Ocean View Inv. Co.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997))) (brackets in original).

### III. *DISCUSSION*

### A. *The HPD's June 3, 1997 Motion Should Be Treated As A Motion For Judgment On The Pleadings And Not As A Motion For Summary Judgment.*

The plaintiffs first argue that the circuit court erred both in failing to treat the HPD's June 3, 1997 motion as a motion for summary judgment and in granting it as a "motion to dismiss." It is questionable whether the characterization of the HPD's motion would have affected the outcome of this matter, inasmuch as we hold *infra* in section III.B that the plaintiffs failed to state a claim against the HPD upon which relief could be granted, and it therefore follows, *a fortiori,* that such a complaint must of necessity succumb to a motion for summary judgment. Nevertheless, we address the plaintiffs' procedural argument in the interest of analytical clarity.

The HPD purported to bring its motion "pursuant to Rules 12(b)(6), 12(c) and 17(d)(5) of the Hawaii Rules of Civil Procedure." HRCP Rule 17(d)(5) concerns the requirements for dismissal of a complaint against a defendant, who is identified by a fictitious name, on the basis that the defendant's actual identity could not be ascertained.[2] That rule is obviously inapposite to this case, inasmuch as both the Honolulu Police Department and the City and County

---

2. HRCP Rule 17(d) (1996) provides in relevant part:

**Unidentified Defendant.**

(1) When it shall be necessary or proper to make a person a party defendant and the party desiring the inclusion of the person as a party defendant has been unable to ascertain the entire name of the defendant or a part of his name to ascertain his identity, the party desiring the including of the person as a party defendant shall in accordance with the criteria of Rule 11 of these rules set forth in a pleading the person's interest in the action, so much of

his name as is known (and if unknown, a fictitious name shall be used), and shall set forth with specificity all actions already undertaken in a diligent and good-faith effort to ascertain the person's full name and identity.

. . . .

(5) A party defendant who has been named or identified in accordance with this rule may have dismissal of one or more claims against him if he shows in a timely manner that the delay in naming or identifying him has caused him substantial prejudice and if the interests of justice so require.

of Honolulu were named as defendants from the beginning of the lawsuit.

Likewise, HRCP Rule 12(b)(6) (1996) [3] is inapplicable, inasmuch as the HPD had filed its answer to the first amended complaint *before* it filed its "motion to dismiss." *See Dunlea v. Dappen,* 83 Hawai'i 28, 31 n. 3, 924 P.2d 196, 199 n. 3 (1996) (holding that "[a] post-answer Rule 12(b)(6) motion is untimely and some other vehicle . . . must be used to challenge the failure to state a claim for relief" (citations and internal quotation marks omitted)). Instead, the HPD's "motion to dismiss" the complaint should be considered, at least initially, as a motion for judgment on the pleadings pursuant to HRCP Rule 12(c). *See id.* (treating the defendant's "motion to dismiss," filed after the defendant had filed an answer to the complaint, as a motion for judgment on the pleadings).

HRCP Rule 12(c) (1996) provides:

**Motion for Judgment on the Pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. *If, on motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56,* and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

(Emphasis added.)

▌ The plaintiffs argue that, although there were no attachments to the HPD's June 3, 1997 motion that went beyond the pleadings, the HPD's memorandum in support of its motion made references to facts outside the pleadings and, therefore, that the motion was transformed into a motion for summary judgment. This court "ha[s] recognized that *consideration* of matters outside the pleadings transforms a motion seeking dismissal of a complaint into an HRCP 56 motion for summary judgment." *Baehr,* 74 Haw. at 546, 852 P.2d at 53 (citing, *inter alia, Au v. Au,* 63 Haw. 210, 213, 626 P.2d 173, 176 (1981), and *Del Rosario v. Kohanuinui,* 52 Haw. 583, 483 P.2d 181 (1971)) (emphasis added). However, "resort to matters outside the record, by way of '[u]nverified statements of fact in counsel's memorandum or representations made in oral argument' or otherwise, cannot accomplish such a transformation." *Id.* (quoting *Au,* 63 Haw. at 213, 626 P.2d at 177). The foregoing exception to the "transformation" rule is intuitive; the circuit court may not properly base its decision on such unsupported representations by counsel, even in the context of a motion for summary judgment, because such representations are not admissible. *See Au,* 63 Haw. at 213, 626 P.2d at 177. In other words, unverified statements of fact in counsel's memoranda cannot transform a motion for judgment on the pleadings (or a motion to dismiss) into a motion for summary judgment because, as unsworn, out-of-court statements of counsel, they constitute hearsay and should, therefore, be given no effect at all.[4] *See* Hawai'i Rules of Evidence (HRE) Rules 801(3) (defining hearsay) and 802 (providing that hearsay is generally inadmissible) (1993); HRCP Rule 56(e) (1996) (providing that supporting affidavits "shall set forth such facts as would be admissible in evidence"); *McCarthy v. Yempuku,* 5 Haw.App. 45, 53–54, 678 P.2d 11, 17 (1984) (holding that a trial court cannot rely on hearsay evidence in deciding a motion for summary judgment (citing *Pacific Concrete Federal Credit Union v. Kauanoe,* 62 Haw. 334, 614 P.2d 936

---

3. HRCP Rule 12(b)(6) provides:

(b) **How presented.** Every defense, in law .or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted[.]

4. We note that there is no indication in the record that the circuit court in fact relied upon any facts that were not alleged in the first amended complaint in reaching its ruling on the HPD's motion. Accordingly, we assume that the circuit court did not do so. *Cf. Rodriguez v. Nishiki,* 65 Haw. 430, 437 n. 4, 653 P.2d 1145, 1150 n. 4 (1982) ("assum[ing] for purposes of appellate review that the trial court did not base its findings" on hearsay evidence in ruling on a motion for summary judgment).

(1980); *Brown v. Bishop Trust Co., Ltd.*, 44 Haw. 385, 355 P.2d 179 (1960), *reh'g denied*, 44 Haw. 687, 361 P.2d 1043 (1961); *Vlasaty v. Pacific Club*, 4 Haw.App. 556, 670 P.2d 827 (1983); *Wolfer v. Mutual Life Ins. Co. of New York*, 3 Haw.App. 65, 641 P.2d 1349 (1982))).

Accordingly, the HPD's motion for judgment on the pleadings was not "transformed" into a motion for summary judgment by virtue of its counsel's representations, and we will analyze the motion under the standard of review appropriate for HRCP 12(c) motions, as set forth *supra* in section II.A.

B. *Under The Circumstances Of The Present Appeal, The HPD Owed No Duty To The Plaintiffs As Particular Members Of The Public.*

The plaintiffs next argue that the circuit court erred because their complaint stated a viable claim for relief, and a number of factual disputes regarding that claim remained to be determined. As the plaintiffs have made clear in their filings in the circuit court and on appeal, the heart of their complaint against the HPD is their claim that the HPD "negligently released" Aaron, thereby allowing him to rape and murder Aleisea. As discussed below, for reasons of public policy, we decline, under circumstances such as those alleged in the plaintiffs' first amended complaint, to recognize a claim for relief for "negligent release" by the police.

■ "[T]he failure of the police to provide protection is ordinarily not actionable." *Freitas v. City and County of Honolulu*, 58 Haw. 587, 590, 574 P.2d 529, 532 (1978) (citation omitted).[5] *See also Namauu v. City and County of Honolulu*, 62 Haw. 358, 363, 614 P.2d 943, 946 (1980). In *Freitas*, this

court recognized an exception to the foregoing rule "where police action has increased the risk of harm and there is negligence in providing protection against the enhanced danger." 58 Haw. at 590, 574 P.2d at 532 (citation omitted).

■ The plaintiffs do not claim on appeal, and their amended complaint does not appear to allege, that the HPD increased the risk of harm to Aleisea by arresting Aaron. Rather, they argue that, by taking Aaron into custody, the HPD assumed a special duty to exercise reasonable care in its decision whether and when to release him. In support, they urge this court to adopt the reasoning of Restatement (Second) § 319, which provides that "[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

In connection with the plaintiffs' theory of liability based on Restatement (Second) § 319, we note that the primary purpose in performing a NCIC check is not to protect the Hawai'i public, but to carry out this state's statutory duties pursuant to HRS chs. 832 and 834 (1993). HRS ch. 832, Hawaii's version of the Uniform Criminal Extradition Act, governs procedures for returning fugitives from other states who are arrested in Hawai'i. HRS § 832–2 (1993) provides in relevant part that "it is the duty of the governor of this State to have arrested and delivered up to the executive authority of any state of the United States any person who is charged in that state with treason, felony, or other crime, who has fled from justice and is found in this State." HRS ch. 834, Hawaii's

---

5. A number of other jurisdictions that adhere to this rule characterize it as corollary of the "public duty doctrine." *See, e.g., Fisk v. Lemons*, 201 W.Va. 362, 497 S.E.2d 339, 343 (1997). "Under the common law rule known as the 'public duty doctrine,' a municipality and its agents are deemed to act for the benefit of the general public rather than specific individuals. Thus, ordinarily, the municipality or its agents may not be held liable to specific individuals for the failure to furnish them with public protection." *Stafford v. Barker*, 129 N.C.App. 576, 502 S.E.2d 1, 3, *review denied*, 348 N.C. 695, 511 S.E.2d 650 (N.C.1998) (citation omitted). Hawaii's appellate courts have never employed the term "public duty doctrine" to describe the *Freitas* rule. Inasmuch as the only question before this court in the present case is whether there is liability in the context of the release of a detainee by the police, it is unnecessary for us to address, as a global matter, the scope of public agents' liability generally stemming from acts performed "for the benefit of the general public." Accordingly, we do not refer to the *Freitas* rule herein as the "public duty doctrine."

enactment of the "Agreement On Detainers," governs procedures for sending persons incarcerated in this state to other states, "in which an untried indictment, information or complaint is pending," for disposition of those indictments, informations, or complaints. The only potential *local* uses of NCIC information would be for the investigation of extended criminal enterprises and determinations regarding bail or sentencing. None of these are at issue in the present case.

■ Arguably, therefore, the HPD owed no duty *to the plaintiffs* in this case to exercise reasonable care in performing the NCIC check; rather, the HPD's duty, if any, was arguably owed solely to the State of Colorado. Accordingly, with regard to the HPD's alleged negligence in connection with the NCIC check, this court need not address the plaintiffs' arguments based on Restatement (Second) § 319. Nevertheless, we address them *infra* because the plaintiffs also claim, pursuant to the first amended complaint, that the HPD was negligent in releasing Aaron despite having received his confession to the attempted sexual assault, in connection with which he had originally been detained.

This court has discussed the rationale underlying Restatement (Second) § 319 in various contexts, but we have never directly addressed the applicability of the section in circumstances such as those of the present appeal. Closest factually to the case at bar appears to be *Seibel v. City and County of Honolulu*, 61 Haw. 253, 602 P.2d 532 (1979). *Seibel* concerned the murder of a fifteen-year-old girl by Paul Luiz, a man with a "history of committing serious sex offenses," who had, not long before, been charged by the Office of the Prosecuting Attorney for the City and County of Honolulu with "rape, abduction, sodomy, rape in the first degree, sodomy in the first degree[,] and kidnapping involving several women." *Id.* at 254, 602 P.2d at 534 (internal quotation marks omitted). Luiz's motion for a judgment of acquittal of the charges on the basis of mental

illness had been granted by the circuit court, and, at the time of the murder, Luiz was on conditional release from detention pursuant to the circuit court's order requiring him to undergo outpatient treatment with his psychiatrist. *Id.* at 255, 602 P.2d at 535.

During the period of his conditional release, Luiz allegedly attacked a prostitute with a steak knife and sodomized her against her will. *Id.* at 256, 602 P.2d at 535. A deputy prosecuting attorney was informed of the incident, but because "she had no knowledge of the male suspect's identity, or his past criminal offenses, and also because the complainant was an alleged prostitute, she did not press forward with the complaint." *Id.* A detective on the case similarly advised another deputy prosecuting attorney, who was familiar with Luiz's case. *Id.* However, that deputy prosecuting attorney also failed to act. *Id.* Several months later, Luiz killed the teenage victim. *Id.*

The plaintiffs, family members of the homicide victim, filed a complaint against the City and County of Honolulu, arguing that the prosecutors had been negligent in failing to monitor Luiz after having been informed of the incident that had occurred during his conditional release. *Id.* On the City's motion, the circuit court dismissed the complaint with prejudice. *Id.* at 253–54, 602 P.2d at 536.

On appeal, this court noted that, "[g]enerally, a defendant is not responsible for (that is, he has no duty to control) the behavior of a third person unless there is a 'special relationship' between the defendant and either the third person who may threaten harm or the party who is the victim of the harm." *Id.* at 257, 602 P.2d at 536 (citing Restatement § 315[6]). However, the *Seibel* plaintiffs claimed that the prosecutors were bound, pursuant to the circuit court's order of conditional release, to exercise reasonable care in monitoring Luiz's behavior. *Id.* Because the circuit court's order did not expressly impose

---

6. Restatement (Second) § 315 provides:
 There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
 (a) a special relation exists between the actor and the third person which imposes a duty

upon the actor to control the third person's conduct, or
 (b) a special relation exists between the actor and the other which gives to the other a right to protection.

such a duty on the Office of the Prosecuting Attorney, the plaintiffs argued that it was implied by the order and, in support of their position, "directed" the *Seibel* court's attention to Restatement (Second) § 319. *Id.* at 259, 602 P.2d at 537. However, because the Office of the Prosecuting Attorney did not have custody over Luiz, this court ruled that it had not "take[n] charge of" him, as required in order to trigger the operation of Restatement (Second) § 319. *Id.* at 259–60, 602 P.2d at 537–38. The *Seibel* court explained its reasoning as follows:

> To begin with, we find it useful to examine the reasons for a similar duty which can be imposed in other relationships, such as that of a parent to control his child, a master to control his servant, and institutional custodian to control its wards. The basis for imposing a duty on the parent, master[,] or institutional custodian to control the conduct of a child, servant[,] or ward is that, because of the relationship between the parties, the parent, master[,] or institutional custodian is able or should be able to foresee the risk created by the other and can or should be able to take precautions against the risk. However, unlike the parent, master[,] or institutional custodian who has *de facto* or *de jure* custody or control over the child, servant[,] or ward, the [Office of the Prosecuting Attorney] did not have custody or control over Luiz.

*Id.* at 260, 602 P.2d at 537–38 (footnotes omitted). Accordingly, the *Seibel* court held that there had been no "special relationship" between the Office of the Prosecuting Attorney and Luiz and that, therefore, the facts of the case fell outside the ambit of Restatement (Second) § 319. *Id.* at 261, 602 P.2d at 538. *Cf. Touchette v. Ganal,* 82 Hawai'i 293, 299–301, 922 P.2d 347, 353–55 (1996) (holding that, "without more, a marital relationship does not alone constitute a 'special relation' under [Restatement (Second)] section 315 so as to merit the imposition of a duty to warn others or control the actions of a spouse," *inter alia,* because the relationship did not impart upon one spouse the "ability to control" the actions of the other).

In the present case, there is no question that Aaron was in the custody of the HPD prior to its allegedly negligent decision to release him and that the HPD, therefore, had the "ability to control" him. Had circumstances been different, *i.e.,* had no mistake been made in entering his name and social security number into the NCIC database, or had the police accorded the proper weight to Aaron's alleged confession, the HPD *could* have "taken precautions against the risk" that Aaron would attack a member of the public by serving the Colorado arrest warrant or by continuing his detention based on the alleged June 25, 1993 attempted sexual assault. However, the question remains whether, as a public policy matter, this court should recognize such a duty, owed by the HPD to particular members of the public, with respect to an allegedly negligent release of a criminal suspect from police custody.

*Ajirogi v. State,* 59 Haw. 515, 583 P.2d 980 (1978), concerned an action commenced by two plaintiffs, who were injured in a collision with an automobile driven by a mental patient, who, in turn, had escaped from a state hospital. The plaintiffs alleged that the state was liable for the hospital's actions pursuant to the principles enumerated in Restatement (Second) § 319. *Id.* at 520, 583 P.2d at 984. Ultimately, the *Ajirogi* court deemed it unnecessary to address the question whether the hospital had "taken charge" of the patient for purposes of Restatement (Second) § 319 because it determined that the hospital could not have foreseen the plaintiffs' particular injury as a result of the patient's negligent operation of an automobile. *Id.* at 522, 527, 583 P.2d at 986–87, 988. In a footnote, however, the *Ajirogi* court raised the following concerns regarding the applicability of Restatement (Second) § 319:

> A substantial body of authority imposes liability upon a state with respect to harms committed by prisoners or mental patients who are negligently released or permitted to escape. Yet liability is generally denied for failure of the state to restrain the same individual before he has been physically apprehended, except where official action has increased the risk of harm. *Cf. Freitas* .... Prevention of harm may be accomplished by preservation of general or-

der or by detention of potentially harmful individuals. Both methods involve much the same questions of policy and allocation of public resources. The present is a period of expanding expectations of government action. *Where a duty assigned to a public employee is ineptly performed, but the risk of harm to individuals in the community is not increased thereby as compared to that which would have existed had no governmental action been attempted, there may be strong public policy considerations against recognizing governmental tort liability for the harms which the public employee failed to prevent.*

*Id.* at 522 n. 3, 583 P.2d at 985 n. 3 (some citations omitted) (emphasis added).

Although Restatement (Second) § 319 was not expressly invoked, the public policy considerations to which the *Ajirogi* court alluded played a central role in *Hulsman v. Hemmeter Development Corp.*, 65 Haw. 58, 647 P.2d 713 (1982). In *Hulsman,* the plaintiff alleged that a convicted felon had advised his probation officer during a presentence interview that he was in possession of a rifle in a cardboard box, which he had brought with him to the interview. 65 Haw. at 59–60, 647 P.2d at 716. After his probation officer allowed him to leave without acting on that information, the felon proceeded to the plaintiff's apartment and shot her. *Id.* at 60, 647 P.2d at 716. The plaintiff sued, *inter alia,* the state under a theory of *respondeat superior,* alleging that the state was liable for the probation officer's negligence. *Id.*

On appeal, this court held that a probation officer, as a functionary of the court, was absolutely immune, pursuant to the doctrine of judicial immunity, from liability for negligence in the "preparation, investigation[,] and presentation of a pre-sentence report" and that the state, as his employer, was likewise immune. *Id.* at 64, 647 P.2d at 719. The *Hulsman* court explained that

[t]he reasoning which justifies this rule is based primarily on public policy. As the

court stated in *Creelman v. Svenning,* [67 Wash.2d 882, 410 P.2d 606,] 608 [ (Wash. 1966) ]:

The public policy which requires immunity for the prosecuting attorney, also requires immunity for both the state and county for acts of judicial and quasi judicial officers in performance of the duties which rest upon them; otherwise objectives sought by immunity to the individual officers would be seriously impaired or destroyed.

If the prosecutor must weigh the possibilities of precipitating tort litigation involving the county and the state against his action in any criminal case, his freedom and independence in proceedings with criminal prosecutions will be at an end.

The public advantage of free, independent, and untrammeled action by the prosecuting attorney outweighs the disadvantage to the private citizen in the rare instance where he might otherwise have an action against both the county and state, either or both.

*Id.* at 62, 647 P.2d at 717.

Similarly, in *Seibel v. Kemble,* 63 Haw. 516, 524, 631 P.2d 173, 178 (1981) (involving a separate lawsuit arising out of the same homicide that precipitated *Seibel v. City and County of Honolulu, supra* ), this court extended the doctrine of judicial immunity to cover the activities of court-appointed psychiatrists, fearing that, "if court-appointed psychiatrists are not given the freedom to make difficult decisions, more and more persons will be institutionalized because of the possible adverse consequences." (Citation omitted.)

*Hulsman* and *Kemble* addressed questions of immunity, whereas, in the present case, the HPD has not invoked immunity as a defense; rather, the issue is the more fundamental one of whether the HPD owes a duty to the plaintiffs, as individual members of the public, in the first instance.[7] Howev-

---

7. Immunity would not be a viable defense in any event, inasmuch as the state has expressly waived it in HRS § 662–2 (1993).

"The basic ... [principle] of governmental tort liability in Hawaii [now] is that the State and its political subdivisions shall be held accountable for the torts of governmental employees

er, their logic is instructive, inasmuch as, in determining whether to recognize a new duty in tort, considerations of public policy are paramount:

> This court has stated in the past that the construct of "duty," within the context of negligence principles, is "only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Cootey v. Sun Inv., Inc.*, 68 Haw. 480, 484, 718 P.2d 1086, 1090 (1986). The determination as to "whether a duty exists," for purposes of such negligence analysis, therefore entails "a question of fairness that involves a weighing of the nature of the risk [to which the novel duty relates], the magnitude of the burden of guarding against the risk, and the *public interest in the proposed solution.*" *Hao[ v. Campbell Estate]*, 76 Hawai'i 77, 80, 869 P.2d [216,] 219 [ (1994) ] (citations

and internal quotation marks omitted) (emphasis added).

*Tabieros*, 85 Hawai'i at 353, 944 P.2d at 1296 (some brackets added and some in original) (emphasis in original).

In its answering brief, the HPD suggests that

> [i]f this Court were to impose a legal duty such that it would support an individual action of negligence under th[is] set of facts, the deployment of police resources would be misdirected and indirectly determined by this Court. Most importantly, there would be no end to whom the legal responsibility would be owed under such broad facts and a colossal financial burden would be incurred for the anticipated litigation that would result. The respective police departments would become guarantors of safety for an infinite number of individuals, an impossible burden to meet

---

' ... in the same manner and to the same extent as a private individual under like circumstances ...' HRS § 662–2." *Salavea v. City and County [of Honolulu]*, 55 Haw. 216, 220, 517 P.2d 51, 54 (1973).

*Cootey v. Sun Inv., Inc.*, 68 Haw. 480, 483, 718 P.2d 1086, 1089 (1986) (quoting *First Ins. Co. of Hawaii v. International Harvester Co.*, 66 Haw. 185, 189, 659 P.2d 64, 67 (1983)).

We note that several other jurisdictions have interpreted their statutory equivalents of HRS § 622–2 to preclude the application of the "public duty doctrine," *see supra* note 5, on the basis that the "public duty doctrine creates immunity where [the] Legislature has removed it." *See Jean W. v. Commonwealth*, 414 Mass. 496, 610 N.E.2d 305, 312–13 (1993) (Liacos, C.J., concurring) (citing *Adams v. State*, 555 P.2d 235 (Alaska 1976), and collecting cases from other jurisdictions). However, " 'a clear majority of jurisdictions continue to adhere to the public duty doctrine, despite the passage of statutes modifying or abolishing the doctrine of governmental immunity, concluding that, in both law and policy, the rule is sound and necessary.' " *Holsten v. Massey*, 200 W.Va. 775, 490 S.E.2d 864, 873 (1997) (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 399 (Tenn.1995) (footnote omitted)) (footnote omitted). Moreover, in the present case, the issue is whether this court should recognize a *new* duty in tort on the part of the police. Accordingly, we perceive no conflict between today's holding and HRS § 662–2. As this court observed in *Cootey*, HRS § 622–2

does not result in governmental liability for all negligent acts of government employees.
The State Tort Liability Act ... did not create any cause of action where none existed before. The effect of the Act is to waive

immunity from traditionally recognized common law causes of action in tort, other than those expressly excluded. It was not intended to visit the sovereign with novel liabilities. (Citations omitted.)

*Figueroa v. State*, 61 Haw. 369, 384, 604 P.2d 1198, 1207 (1979). *See also Wilson v. Nepstad*, 282 N.W.2d 664, 676 (Iowa 1979) (McCormick, J., concurring specially) ("[T]he liability of the municipality for the torts of its officers, employees, and agents during the course of their employment ... presupposes the commission of an actionable tort. It does not expand conduct which is deemed tortious."); *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 541, 247 N.W.2d 132, 140 (1976) ("[N]egligence plus an unbroken sequence of events establishing cause-in-fact does not necessarily lead to a determination that the defendant is liable for plaintiff's injuries.").

Fundamental in any determination of liability for negligence is the existence of [a] duty owed by the putative tortfeasor to the injured person. *First Insurance Co. of Hawaii v. International Harvester Co.*, 66 Haw. at 189, 659 P.2d at 67....

68 Haw. at 483–84, 718 P.2d at 1090.

HRS § 662–2 provides in relevant part that state entities are liable "to the same extent as a private individual and under like circumstances." Our policy concerns in the present case involve the unique role of the police in their capacity as *public* agents, *see infra*, and therefore "a *private* individual" (emphasis added), by definition, could not be viewed as acting "under like circumstances."

and which should not be the state of the law.

However, as the plaintiffs correctly note, the HPD would not be the "guarantor[ ] of safety for an infinite number of individuals" pursuant to Restatement (Second) § 319; rather, it would potentially be liable only to the *foreseeable* victims of detainees whom it *negligently* releases, having initially taken custody of them, at least in part, to prevent such individuals from doing further harm. That burden, in and of itself, is no more onerous than any attending the plethora of standards of care to which *all* persons are held. Moreover, while the HPD's bare assertion that its legal costs would markedly increase if Restatement (Second) § 319 were applied to the acts of its officers seems intuitively accurate, it nevertheless constitutes an insufficient basis for foreclosing liability for conduct that unnecessarily places members of the public at substantial risk.

Although neither party raises the issue, we are more concerned with the effect that tort liability for overly hasty release is likely to have on individuals detained by the police. As the Montana Supreme Court observed in disposing of a similar argument in *Phillips v. City of Billings*, 233 Mont. 249, 758 P.2d 772, 776 (1988), "[f]ourth amendment rights naturally compete with a police officer's duty to protect the public." The rule would not only "force police officers to choose between liability for failure to arrest, and liability for false arrest," *Phillips*, 758 P.2d at 776, but it would impair the capacity of the police objectively to assess their responsibilities pursuant to article I, section 7 of the Hawai'i Constitution (1978) and the fourth amendment to the United States Constitution.[8] If the risk of tort liability to unidentified members of the public were injected into the already complex "probable cause" calculus, the police would inevitably be pressured to err more often on the side of excessive detention.

It almost goes without saying that "[t]he power of arrest is an awesome one and is subject to abuse." *State v. Lloyd*, 61 Haw. 505, 511, 606 P.2d 913, 918 (1980) (quoting *United States v. Santana*, 427 U.S. 38, 48, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (Marshall, J., dissenting)). Beyond the obvious inconvenience and stigma that attach to any arrest, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), "prolonged detention based on incorrect or unfounded suspicion may unjustly 'imperil [a] suspect's job, interrupt his source of income, and impair his family relationships.'" *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). In short, any policy encouraging the police to engage in unnecessarily prolonged detentions would have a serious impact on the liberty interests of those detainees.

The plaintiffs cite to several decisions from other jurisdictions, which, they claim, support the adoption of the principles enunciated in Restatement (Second) § 319 in the context of police arrests. *See Green v. Livermore*, 117 Cal.App.3d 82, 172 Cal.Rptr. 461 (1981); *Duarte v. City of San Jose*, 100 Cal.App.3d 648, 161 Cal.Rptr. 140 (1980); *Ransom v. City of Garden City*, 113 Idaho 202, 743 P.2d 70 (1987); *Irwin v. Town of Ware*, 392 Mass. 745, 467 N.E.2d 1292 (1984); and *Karbel v. Francis*, 103 N.M. 468, 709 P.2d 190 (Ct.App. 1985).[9] With the possible exception of *Irwin*, however, *none* of these decisions involved a tortfeasor who had caused injury after being released from police custody, and only *Irwin* directly addresses the policy concerns articulated in this opinion, albeit in a cursory manner.

8. Both the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution provide in relevant part that "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures ... shall not be violated[.]"

9. The plaintiffs also cite to *Coleman v. State*, 881 S.W.2d 344 (Tex.Crim.App.1994), *cert. denied*, 513 U.S. 1096, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995), a criminal appeal, for the proposition that "[p]articipation in an offense similar to the one on trial constitutes evidence of future dangerousness." The evidentiary question that was decided in *Coleman*, however, is utterly inapposite to the inquiry whether the HPD ought to be subject to an enforceable duty in tort to protect individual members of the general public from persons whom it releases from custody.

In *Green* and *Ransom*, the plaintiffs alleged that the police had been negligent in allowing drunken *passengers* to drive away after having arrested the drunken *driver* of a vehicle. *See Green*, 172 Cal.Rptr. at 463; *Ransom*, 743 P.2d at 71. The passengers in question had neither been arrested nor taken into police custody, and the policy concerns, articulated above, regarding the constitutional ramifications of interfering with police decisions to release *arrestees*, therefore, do not apply to them.[10]

Similarly, in *Duarte*, the plaintiffs alleged that a police officer had been negligent in leaving a suspected drunken driver alone in his police car without handcuffs. 161 Cal. Rptr. at 141. The arrestee jumped into the front seat and sped away in the police car, pursued by other officers, and, in the ensuing chase, caused an accident that injured the plaintiffs. *Id.* at 141–42. Thus, the police officer's liability in *Duarte* did not stem from a voluntary decision to release the arrestee, but, rather, from negligently allowing the arrestee to escape in the police vehicle. The question of police liability in connection with the conduct of an *escapee* is not before this court in the present case. Moreover, the *Duarte* court's reliance on California Vehicle Code § 17001, which provides that "[a] public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of employment," was subsequently disapproved by the California Supreme Court in *Ladd v. County of San Mateo*, 12 Cal.4th 913, 50 Cal.Rptr.2d 309, 316, 911 P.2d 496 (1996).

In *Karbel*, the New Mexico appellate court held that private security guards, who were employed by a college and who had allowed a suspected drunken driver to drive away from campus after having detained him, could be held liable in tort. 709 P.2d at 193–94. *Karbel* relied on an earlier decision of the New Mexico Supreme Court, *Schear v. Board of County Commissioners of the County of Bernalillo*, 101 N.M. 671, 687 .P.2d 728 (1984), in which that court held that a New Mexico statute, which mandated that it was the "duty of every sheriff, deputy sheriff, constable and every other peace officer to investigate all violations of the criminal laws of the state which are called to the attention of any such officer, or of which he [was] aware," *Schear*, 687 P.2d at 729 (quoting N.M. Stat. Ann. § 29–1–1 (Repl.Pamp.1979)) (emphasis omitted), formed the basis for the imposition of a duty of reasonable care in the performance of such "investigations." There is no comparable statute in Hawai'i, and the plaintiffs in the present case have not called into question the general rule articulated in *Freitas* and *Namauu*. Accordingly, *Karbel* is of no assistance to the plaintiffs.

The *Irwin* court failed to disclose the factual background of the matter before it, explaining only that the plaintiffs had "[c]harge[d] that police officers of the [Town of Ware] negligently failed to take into protective custody a motor vehicle operator who subsequently caused an accident resulting in harm to the plaintiffs." 467 N.E.2d at 1295. Accordingly, it is unclear whether the police had detained or arrested the operator prior to the accident in that case. Like the New Mexico Supreme Court in *Schear*, *Irwin* relied on state statutes as the basis for imposing tort liability on the police who failed to act. *Irwin*, 467 N.E.2d at 1302. Those statutes provided, *inter alia*, that "[a]ny officer authorized to make arrests ... may arrest without warrant any person ... who the officer has probable cause to believe has operated a motor vehicle while under the influence of intoxicating liquor," *id.* at 1302 (quoting Mass. Gen. L. ch. 90, § 21, (1973)), and that "police officers of all cities and towns ... shall suppress and prevent all disturbances and disorder." *Id.* at 1302 (quoting Mass. Gen. L. ch. 41, § 98, as

---

**10.** Moreover, in *Harris v. Smith*, 157 Cal.App.3d 100, 203 Cal.Rptr. 541, 543 (1984), a case involving substantially similar facts to those of *Green* and *Ransom*, the California Court of Appeals reached the opposite result, "concluding" that *Green* had been "implicitly overrule[d]" by the California Supreme Court's opinions in *Davidson*

*v. City of Westminster*, 32 Cal.3d 197, 185 Cal. Rptr. 252, 649 P.2d 894 (1982), and *Williams v. State*, 34 Cal.3d 18, 192 Cal.Rptr. 233, 664 P.2d 137 (1983). Other jurisdictions facing similar records have been in accord with the *Harris* result. *See, e.g., Landis v. Rockdale County*, 212 Ga.App. 700, 445 S.E.2d 264 (Ga.Ct.App.1994).

amended through St.1970, ch. 181).[11] As noted above, the plaintiffs in the matter before us do not direct this court's attention to any comparable statutes in this jurisdiction.

Nevertheless, we note that the *Irwin* court expressly rejected the defendant Town of Ware's policy arguments, including the risk of infringing upon the constitutional rights of suspects, as follows:

> [T]he town claims we must focus on the difficulty inherent in determining whether a driver is intoxicated. The town asserts that imposing liability on police officers for negligence in making this "often impossible judgment task" will lead police officers to arrest drivers whenever they suspect intoxication rather than not arrest them and risk a negligence action against the public employer. *The town asserts this resulting inclination to arrest will chill constitutionally protected freedoms of the general public.* In the alternative, the town adds, the police may avoid interfering in doubtful cases, for fear of tort actions by arrested persons, and this too would not be in the public interest. *We think these considerations are speculative at best. More important, they are simply not relevant to the issue whether the police have a duty.*

467 N.E.2d at 1304 (emphases added).

We believe, contrary to the *Irwin* court's assertion, that the protection of constitutional rights is of the utmost public importance, and, therefore, that any tendency to chill those rights is highly relevant to an analysis of whether the creation of a new duty in tort comports with the public policy of the state. Moreover, the potential chilling effect of the duty proposed by the plaintiffs in the present matter is apparent and undeniable. Ensuring that arrestees are not subjected to unnecessary detention is at least as important to this state's public policy as the ability of its prosecutors and judicial officers freely to exercise their discretion, *see Hulsman, supra,* and to ensure that persons examined by court-appointed psychiatrists are not unnecessarily institutionalized. *See Kemble, supra.*

The majority of other jurisdictions that have recognized exceptions to the general rule that the police are not subject to liability for failing to provide protection have done so only where the police have either themselves increased the risk of harm to the injured party or have somehow formed a special relationship with the injured party—and not with the defendant. *See, e.g., Luber v. City of Highland,* 151 Ill.App.3d 758, 104 Ill.Dec. 583, 586, 502 N.E.2d 1243, 1246 (1986), *appeal denied,* 114 Ill.2d 547, 108 Ill.Dec. 418, 508 N.E.2d 729 (1987); *Melendez ex rel. Melendez v. City of Philadelphia,* 320 Pa.Super. 59, 466 A.2d 1060, 1063 (1983); *Stafford v. Barker,* 129 N.C.App. 576, 502 S.E.2d 1, 5 , *review denied,* 348 N.C. 695, 511 S.E.2d 650 (N.C.1998); *Fisk v. Lemons,* 201 W.Va. 362, 497 S.E.2d 339, 344 (1997).

We need not, in the present case, resolve the possibility, implied in *Seibel,* 61 Haw. at 260, 602 P.2d at 537–38, that we might at some future time recognize a "special relationship" between a tortfeasor and the police in some context. For present purposes, in light of the constitutional rights at stake, we adopt the majority approach discussed above and decline to apply Restatement (Second) § 319 to the decision of a police officer to release a detainee from custody.

---

**11.** Concurring in a subsequent opinion, several justices of the Massachusetts Supreme Judicial Court "announced" their "intention to abolish" the common law public duty doctrine "at the first available opportunity after the conclusion of the 1993 session of the Legislature," on the basis that it was inconsistent with Massachusetts' statutory waiver of sovereign immunity. *See Jean W.,* 610 N.E.2d at 307 (Liacos, C.J., concurring) (footnote omitted); *see also supra* note 7. In their "announcement," the justices invited the legislature to resolve the issue through future legislation if it disagreed with the concurring opinion's reasoning. *Id.*

The legislature responded by amending the state tort liability act in such a way as to enumerate express exceptions to the state's general waiver of liability, *inter alia,* with respect to certain classes of claims relating to fire service, police investigation and protection, and "release, parole, furlough or escape of any person ... unless gross negligence is shown in allowing such release, parole, furlough or escape." *See Rinkaus v. Town of Carver,* 418 Mass. 573, 637 N.E.2d 229, 230 n. 3 (1994); Mass. Gen. L. ch. 258, § 10 (Supp.1998).

Inasmuch as the plaintiffs have alleged no facts to support their allegation that the HPD stood in a "special relation" to Aleisea prior to her death, we hold that they have failed to state a claim for which relief can be granted and that they can prove no set of facts in support of their claim that would entitle them to relief under any alternative theory. Accordingly, the circuit court was correct in granting the HPD's motion for judgment on the pleadings.

## IV. CONCLUSION

Based on the foregoing reasoning, we affirm the circuit court's orders and judgment.