Lacey **PANION** and Gary **Panion, Plaintiffs,**

v.

The **UNITED STATES of America, Defendant.**

Civ. No. 04–00338 SOM/LEK.

United States District Court, D. Hawai'i.

Aug. 16, 2005.

Michael K. Livingston, Davis Levin Livingston Grande, Honolulu, HI, for Plaintiffs.

R. Michael Burke, Office of the United States Attorney, Honolulu, HI, for Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

MOLLWAY, District Judge.

### I. INTRODUCTION.

Plaintiffs Lacey and Gary Panion bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2674, seeking money damages for injuries sustained as a result of a sexual assault by a licensed practical nurse on Lacey Panion while she was hospitalized at Tripler Army Medical Center in Honolulu.

A bench trial was held spanning six days between June 28, 2005, and July 14, 2005. This court now rules that the staff at Tripler failed to exercise reasonable care to protect Lacey Panion from foreseeable harm. The Panions are awarded $906,000.00 in damages.

### II. JURISDICTION.

This court has jurisdiction to hear this case. Plaintiffs have satisfied all procedural prerequisites for filing this lawsuit, including exhausting administrative remedies under the FTCA. *See* Ex. 57, 58.

The United States argues that this court lacks subject matter jurisdiction given the "assault and battery" exception to the United States' waiver of sovereign immunity. The court disagrees with the United States.

The United States is immune from suit except to the extent that it has unequivocally consented to be sued. *LaBarge v. Mariposa County,* 798 F.2d 364, 366 (9th Cir.1986). The FTCA operates as

a limited waiver of this immunity, subjecting the United States to tort liability under certain conditions. *See Bush v. Eagle–Picher Indus., Inc.*, 927 F.2d 445, 447 (9th Cir.1991). Specifically, the FTCA provides that the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

■ The waiver of immunity under the FTCA is limited by 28 U.S.C. § 2680. Section 2680(h) states that immunity is not waived with respect to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Courts therefore lack subject matter jurisdiction to hear claims against the United States under any of these theories of liability. *See Wilson v. Drake*, 87 F.3d 1073, 1076 (9th Cir.1996); *see also Sheridan v. United States*, 487 U.S. 392, 398, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988).

The Supreme Court, however, has read § 2680(h) narrowly, holding that, "in at least some situations[,] the fact that an injury was directly caused by an assault or battery will not preclude liability against the federal government for negligently allowing the assault to occur." *Sheridan*, 487 U.S. at 398–99, 108 S.Ct. 2449. In *Sheridan*, Naval servicemen allowed an obviously inebriated off-duty serviceman to leave a Naval hospital with a loaded firearm. *Id.* at 395, 108 S.Ct. 2449. The inebriated serviceman fired several shots into an automobile, injuring the passengers, who then brought suit against the United States. *Id.* The Court concluded that the United States had assumed responsibility for the inebriated serviceman and had a "good Samaritan" duty to care for him. *Id.* The inebriated serviceman's commission of an intentional tort, as opposed to a simple act of negligence, was irrelevant to the United States' alleged liability for a breach of its own duty. *Id.* at 403, 108 S.Ct. 2449.

In the wake of *Sheridan*, the Ninth Circuit has allowed plaintiffs to pursue claims against the United States for "independent negligent acts or omissions by the federal government that are legal causes of the [plaintiff's] harm," such as negligent supervision or negligent hiring of a person who commits an intentional tort. In *Senger v. United States*, 103 F.3d 1437, 1441 (9th Cir.1996), and *Brock v. United States*, 64 F.3d 1421 (9th Cir.1995), the plaintiffs were allowed to pursue negligence claims against the United States notwithstanding accompanying intentional torts.

■ The Panions seek recovery against the United States under general negligence, medical negligence, and negligent supervision theories. Under *Sheridan, Senger*, and *Brock*, these claims are not barred by 28 U.S.C. § 2680.[1]

## III. *FINDINGS OF FACT.*

Whenever, in the following discussion, this court has mistakenly designated as conclusions of law what are really findings of fact, and vice versa, the court's statements shall have the effect they would have had if properly designated.

---

1. While Ninth Circuit law is clear on this point, this court recognizes that other circuits have barred similar claims. *See, e.g., McNeily v. United States*, 6 F.3d 343 (5th Cir.1993) (a plaintiff "cannot avoid the reach" of the intentional tort exception by "framing his complaint in terms of negligent failure to prevent the excepted harm"); *Franklin v. United States*, 992 F.2d 1492, 1499 (10th Cir.1993) (quoting same language); *Guccione v. United States*, 878 F.2d 32 (2d Cir.1989) (§ 2680(h) excludes claims based on United States' duty to supervise employee).

This bench trial was conducted in accordance with this court's trial procedures for civil nonjury trials, which are reproduced, in substantially the same form followed here, in Appendix A to this court's decision in *Kuntz v. Sea Eagle Diving Adventures Corp.,* 199 F.R.D. 665 (D.Haw.2001). Without objection by any party to the court's procedures, direct testimony was presented by written declaration, with witnesses then subject to live cross-examination and live redirect examination, unless waived.

For ease of reference by the parties and the court, the following findings are presented in numbered paragraphs. The court has access to only rough, not final, trial transcripts and so does not cite live trial testimony by specific transcript page.

*A Chronology of What Occurred*

1. On the afternoon of March 10, 2001, Lacey Panion and her husband, Chief Petty Officer Gary Panion (then at rank E6, Petty Officer First Class), hosted a barbecue at their home to celebrate Gary's return from deployment.[2] Lacey Panion Decl. ¶ 18; Gary Panion Decl. ¶ 31. Lacey and Gary, married since 1994, were then twenty-five and twenty-nine years old, respectively, and had two young sons. Lacey Panion Decl. ¶¶ 1, 8, 16; Gary Panion Decl. ¶ 1. Gary, who worked with technology and communications systems, had been in the Navy since 1990. Gary Panion Decl. ¶¶ 5, 8, 16. Lacey, who had previously provided child care services and had worked in retail sales, was a homemaker at the time. Lacey Panion Decl. ¶¶ 13, 14.

2. Chief Petty Officer Todd Anthony Franklin, a good friend and Gary's superior, attended the barbecue with his family. Franklin Decl. ¶ 10. Eilene Marie O'Neill (then Eilene Marie Philips), Lacey's enlisted friend who worked at Tripler's blood donor center, was also at the barbecue. *Id.* ¶ 11.

3. At the barbecue, many of the adults drank mixed alcoholic drinks and beer. *Id.* ¶ 10. No one, however, appeared intoxicated to Franklin, *id.,* who testified at trial that he did not see Lacey drink anything other than a coke.

4. After the barbecue, at Gary's urging, Lacey and O'Neill treated themselves to a night at the Pearl Harbor Club. Lacey had a high tolerance for alcohol, which ran in her family. Lacey Panion Decl. ¶ 22; Bobbie Licht Decl. ¶ 4. At the club, she had about seven rum-and-coke drinks and three shots of tequila. Lacey Panion Decl. ¶ 24. Nobody anticipated what happened next. Lacey collapsed. Appearing unconscious, she was taken by ambulance to Tripler at about 2:45 a.m. O'Neill Depo. at 14; Ex. 11 at 0006. Gary, who had been called by O'Neill, rushed to Tripler to meet her. Gary Panion Decl. ¶¶ 43–55.

5. In Tripler's emergency room, Lacey began having what appeared to be seizures. *Id.* ¶ 46. She was examined and assigned a rating of 5 on the Glascow Coma Scale, which indicated a low level of alertness. Ex. 11 at 0006–08, 0011–13; James Moon cross-examination. Lacey's blood alcohol level was 0.162%. Ex. 11 at 0189. According to Gary, Lacey looked unconscious in the emergency room. Gary Panion Decl. ¶ 49. Lacey, however, reported short periods of consciousness in which she had severe pain, like "charley horses all over [her] body," and was unable to control any of her muscles. Lacey Panion Decl. ¶¶ 29–33.

6. Doctors repeatedly asked Gary whether Lacey had taken drugs or medi-

2. For convenience in distinguishing between Lacey Panion and Gary Panion, the court refers to them by their first names.

cations, and Gary responded that Lacey was not taking illegal drugs. Gary Panion Decl. ¶¶ 47, 48. Lacey, whose seizurelike activity continued throughout the night, overheard voices at one point referring to her as "nothing but a drunk." Lacey Panion Decl. ¶ 35.

7. There was some suspicion that someone had spiked one of Lacey's drinks with a date-rape drug, perhaps thinking the drink belonged to O'Neill, as O'Neill and Lacey had been sharing drinks at the club and a man had been pursuing O'Neill there. O'Neill Depo. at 59–60. Tripler staff were told about the possibility of a date-rape drug, but performed no tests on Lacey for such a drug. *See* Ex. 11 at 0036, 0047; Nancy Coppin cross-examination.

8. At approximately 6:30 a.m. on March 11, 2001, doctors moved Lacey from the emergency room to the Medical Intensive Care Unit ("MICU"). Ex. 11 at 0046. At admission to the MICU, she was rated as an acuity level "V," on a scale that went up to a level "VI." *Id.* at 0125. A tube was placed down her throat to protect her airway, and she was restrained, to prevent her from taking the tube out. *Id.* at 0011, 0043. During the intubation procedure, sedatives were administered, including Ativan, Versed, and Propofol. Moon Decl. ¶ 5. These medications were in addition to Narcan and Valium, which Lacey received shortly after her admission to the emergency room. *See* Ex. 11 at 0006.

9. At some point between 7:00 a.m. and 8:00 a.m. on March 11, 2001, Gary went home to rest. Gary Panion Decl. ¶ 13. Gary checked around the house for any medications Lacey may have taken and found some pills in a small plastic container. *Id.* ¶ 60. He gave the pills to O'Neill to take to the hospital. *Id.* ¶ 61.

10. At approximately noon on March 11, 2001, Lacey received an additional dose of the sedative Propofol, and Dr. James Moon, a first-year intern in the MICU, performed a lumbar puncture. Moon Decl. ¶ 7. The results of that lumbar puncture revealed no evidence of infection. *Id.* ¶ 6.

11. At approximately 3:30 p.m. on March 11, 2001, Lacey was responsive, but also disoriented and combative. *Id.* ¶ 8. Throughout the day, Lacey passed in and out of consciousness. Lacey Panion Decl. ¶¶ 32, 35, 37. She continued to have seizurelike activity at times. Gary Panion Decl. ¶ 88.

12. Gary returned to the hospital during the afternoon of March 11, 2001. *Id.* ¶ 68. He discussed Lacey's care with Dr. Moon, but was not told what medical procedures would be performed on Lacey during the night. *Id.* ¶¶ 87, 93. When Gary told Dr. Moon that he wanted to stay with his wife, Dr. Moon responded that Lacey would be resting throughout the night. Gary Panion Decl. ¶ 69–95; O'Neill Depo. at 24–26, 84–85. Licensed Practical Nurse Tyrone Fellers, who was assigned to care for Lacey, was in the room during this conversation. Ex. 3; Gary Panion Decl. ¶ 78. In the end, relying on Dr. Moon's comments, Gary returned home. *Id.* ¶¶ 99–101.

13. The airway tube was removed at approximately 8:30 p.m. on March 11, 2001. Ex. 11 at 0078. At some point, the restraints on her arms were removed. Moon Decl. ¶ 17.

14. Elena Nerida, the super charge nurse on the evening of March 11, 2001, was the registered nurse responsible for supervising Fellers throughout the evening shift, which ran until 7:00 the next morning. Nerida Depo. at 22, 26. At 11:00 p.m., Nerida opened the closed door to Lacey's room and saw Fellers rubbing lotion on Lacey's lower legs. *Id.* at 29. The blinds to the room were closed. *Id.* at 41. Nerida did not find the closed door unusual and considered the lotion procedure con-

sistent with nursing procedures. *Id.* at 29. According to Nerida, Lacey's door and blinds remained closed for five hours, between 11:00 p.m. on March 11, 2001, and 4:00 a.m. the next day. *Id.* at 40–41.

15. At approximately 12:30 a.m., Dr. Moon was called into Lacey's room. Moon Decl. ¶ 12. Lacey asked for pain medication. Dr. Moon, not apprehending Lacey's true condition, was concerned that she wanted drugs for nonmedical reasons and told her that she could have only Tylenol or Motrin, nothing stronger. *Id.* At this point, Lacey had another seizure-like episode, which Dr. Moon incorrectly thought might have been faked in an effort to get drugs. *See id.* ¶ 14. Although Dr. Moon's custom and practice was to check on patients several times a night, he does not actually recall having checked on Lacey several times that night, and there is no record that he did so.

16. Three hours later, at approximately 2:00 a.m. on March 12, 2001, Fellers sexually assaulted Lacey Panion. Ex. 2 at 497. Fellers began by massaging Lacey's legs, the second of four massages [3] that he gave her that evening. Ex. 2 at 496; Lacey Panion Decl. ¶ 41. He became aroused during this massage, *see* Ex. 1, and placed his fingers into Lacey's vagina. Lacey Panion Decl. ¶ 42. Lacey had a catheter in her, and Fellers caused her great pain by bumping the catheter repeatedly. *Id.* Lacey began to cry as Fellers pushed so hard that her body moved on the bed. *Id.* Fellers told Lacey that she had "big nipples" and placed his mouth on her left breast as he squeezed on it. *Id.* Lacey attempted to push him away, but she lacked muscle control and was only able to

fling her left arm up to the bed rail. *Id.* Fellers then took Lacey's hand and placed it into his pants, where she felt that he had an erection. *Id.* ¶ 43. Although Lacey was conscious, she was unable to move. Throughout the ordeal, she continued to lack control of her body and could not call out beyond a whisper. Thus, she could not pull her hand out of Fellers's pants or close her legs after he lifted them and they fell open. *Id.* ¶¶ 49–50.

17. Continuing to cry, *id.* ¶ 48, Lacey, hardly able to speak, managed with great effort to tell Fellers at one point, "I don't want you," *id.* ¶ 49. He responded by telling her, "I want you." *Id.* Fellers masturbated and wiped his semen on Lacey's lips. *Id.* ¶ 44; Ex. 2 at 497.

18. Added to Lacey's pain, helplessness, revulsion, and overwhelming fear was her sense of frustration. She could see movement outside her room through the blinds over the glass window, and she could hear people outside her room. She wanted to scream but could not. Knowing that help was nearby but that she could not summon anyone multiplied her suffering. *Id.* ¶ 49. She tried to call out for Gary. *Id.* ¶ 48. Ultimately, after Fellers had completed masturbating, Lacey lost consciousness. *Id.* ¶ 51.

19. The assault "seemed like it went on forever" to Lacey. *Id.* ¶ 47. It lasted so long that Fellers interrupted himself three or four times to leave Lacey, as if something had startled him or he heard a voice from outside the room. *Id.* ¶ 45. No one actually entered the room during the assault. Ex. 2 at 497.

---

**3.** The parties disagree as to whether Nerida saw Fellers providing a "massage," which Nerida might have thought was intended to alleviate discomfort or improve circulation, or whether she saw him "applying lotion," which she might have thought was for skin care purposes. Fellers himself states that, before the sexual assault, he gave Lacey a massage. *See* Ex. 2 at 496. Fellers appeared to view the two acts as identical, and Nerida spoke in her deposition about both the application of lotion and about having seen Fellers massage another patient.

20. Nurse Faith Fraser states that, at approximately 3:00 a.m., she answered the phone and heard someone identify himself as Mr. Panion. Fraser Decl. ¶ 10. She says she asked Fellers, who was standing near the door to Lacey's room, if Lacey could take the call. *Id.* ¶ 12. Fraser says that Fellers passed the phone to Lacey, who took the phone and placed it next to her ear. *Id.* ¶ 14. Gary, however, denies having called his wife at that time and says that he would not have called because Lacey still had a tube in her throat when he left the hospital. Gary Panion Decl. ¶ 101.

21. The court finds Fraser mistaken on this point. Fraser's memory of the phone call was extremely lucid, while her memory of other events that evening was not, and the court finds the contrast damaging to Fraser's credibility on the issue. It is unlikely that, given Lacey's condition during the sexual assault, she would have been able to converse with her husband at 3:00 a.m. This phone call either took place the next evening or did not occur at all.

22. At 4:00 a.m. on March 12, 2001, Nerida went to Lacey's room. The door, while not locked, was open "[j]ust a gap," so that Nerida had to open the door to enter. Nerida Depo. at 39. Nerida saw Fellers sitting at the computer in the room and asked him to take something down to the lab for her. *Id.* at 39–40. Fellers left Lacey's room to do that. *Id.* at 40.

23. Later on Monday, March 12, 2001, O'Neill visited Lacey again. O'Neill Depo. at 32. Finding Lacey awake and very upset, O'Neill called Gary to let him know that Lacey was awake. *Id.* Todd Anthony Franklin also visited Lacey that morning. Franklin Decl. ¶ 14. Franklin noticed that Lacey was dressed in only a thin hospital gown and did not have blankets. *Id.* Thinking she might be cold, Franklin went to hospital staff, who brought blankets for Lacey. *Id.* ¶ 20. While Franklin was in the room with Lacey, he saw her have several seizurelike episodes. *Id.* ¶ 28.

24. Gary arrived at the hospital at approximately noon that day. Gary Panion Decl. ¶ 109. Lacey appeared to him to be in and out of consciousness, and she had difficulty speaking. *Id.* ¶ 112. Lacey told Gary that someone had "messed with her," but Gary could not understand from her what had happened. *Id.* ¶ 118. Lacey was transferred out of the MICU in the afternoon of March 12, 2001. Ex. 11 at 0026. Gary left the hospital at approximately 9:00 that night. It was not until Lacey called Gary later that night that he understood that she had been sexually assaulted. She described in detail what Fellers had done to her. Gary then reported the assault to Lt. Col. Jeffrey Ashley, the head nurse in Tripler's MICU. Gary Panion Decl. ¶¶ 125–132; Ashley Decl. ¶¶ 12, 13.

25. The United States contends that Gary's trial testimony was inconsistent with a statement that he made to Tripler. The court, however, finds no inconsistency. In his statement to Tripler, Gary said that, when he spoke with Lacey at noon on March 13, 2001, Lacey told him that "Mr. Feller 'had messed with her.'" Ex. 10. In the statement, Gary further says that he later spoke to her on the phone. Gary's statement was consistent with his testimony. Indeed, the court found Lacey and Gary to be credible throughout the trial.

26. On March 14, 2001, Lacey was discharged from Tripler. Marino Decl. ¶ 12. The discharge summary stated that Lacey's symptoms were "most likely consistent with intestation/toxication." Ex. 2 to Marino Decl. at 2.

27. After consulting with his supervisors and the military police, Ashley interviewed Lacey. The military police opened a criminal investigation, during which Fellers admitted to sexual contact with Lacey,

but contended that the contact had been consensual. Exs. 1, 2. Lacey was interviewed as part of the investigation and claims that she was treated very rudely by one of the investigators, who did not act as though he believed her. Lacey Panion Decl. ¶ 78. The investigator warned her about consequences if she was lying and tried to make her feel guilty about disrupting Fellers's family. *Id.* ¶ 82.

28. Fellers was later indicted on one count of sexual abuse and two counts of abusive sexual contact. *See* Ex. 4. He pled guilty to one count of sexual abuse. Ex. 5. When he was released on bail pending sentencing, Lacey was upset and felt unsafe. Lacey Panion Decl. ¶ 85. About the same time, the Panions began receiving threatening phone calls, which Lacey associated in her mind with the assault. *Id.* ¶ 86, 87.

29. Lacey was traumatized by the assault. She became moody and depressed and, after returning home, did not leave the house for months. *Id.* ¶ 95. Her response to the sexual assault may have been heightened by her memory of having been sexually assaulted by a neighbor's boyfriend as a young girl. *Id.* ¶ 5.

30. At one point, Lacey considered suicide. *Id.* ¶ 9. Lacey has had counseling but has not yet found a counselor she feels is helpful. *Id.* ¶ 96. She deeply distrusts medical professionals. *Id.* ¶ 99. She is currently taking antidepressants and sleeping pills. *Id.* ¶¶ 103, 104.

31. Lacey was angry at Gary for having left her alone at the hospital and has been distrustful of him since the assault. *Id.* ¶ 91. The Panions severely decreased their physical intimacy and experienced significant marital difficulty following the assault. They have from time to time considered divorce. *Id.* ¶¶ 91, 105.

32. The chronology above provides the backdrop for several factual disputes, discussed below.

### Lacey Panion's Level of Consciousness

33. The parties have offered conflicting anecdotal evidence of Lacey's level of consciousness during her stay in the MICU. The Panions stress Lacey's unconsciousness, while the United States points to Lacey's awareness of her surroundings at various points during the night. Synthesizing the evidence, the court finds that Lacey passed in and out of consciousness from her arrival at Tripler through her discharge from the MICU.

34. When Lacey got to the emergency room, she was rated a 5 on the Glascow Coma Scale, and Nurse Diane Carlson described her condition as follows: "Does not respond to painful stimuli. Does not open eyes." Ex. 11 at 0047. Beginning around 3:30 a.m., and continuing for the next five hours, Lacey was given sedating medications, such as Valium. *See* Laura Burchell–Henson Decl. 26.

35. Dr. Moon testified that the drugs given to Lacey Panion were intended to be "quick-on, quick-off" drugs, meaning that he thought they would take effect quickly and then wear off quickly. Dr. Moon, however, was not well-versed in the appropriate dosages of those medications. While declining to answer questions on cross-examination about the medications on the ground that a pharmacologist or neurologist would be the appropriate person to address those matters, Dr. Moon did say that Valium, Ativan, and Versed are central nervous system depressants, and that these medications have an additive effect, not only with one another but also with alcohol. He was not able to state the appropriate half-lives of these medications, particularly when taken with other medications or alcohol.

36. Relying on Dr. Moon's testimony and on reports by Lacey herself as well as others who observed her, the court finds that these medications affected Lacey's

level of consciousness throughout her time in the MICU. The medications added to the effects of Lacey's medical condition, as well as the alcohol and/or other drugs in her system, on her level of consciousness throughout her stay in the MICU.

*The Risk of Sexual Assault at Tripler*

37. Tripler had a Chaperone Policy in place at the time of the sexual assault on Lacey, which stated, "Patients will be informed of their right to have a chaperone present during any examination, treatment, or procedure." Ex. 38. The Chaperone Policy also said, "When examinations, treatments, or procedures are sensitive or potentially compromising, usually when the genitalia or female breasts are examined or exposed (e.g., pelvic exam, breast exam, prostate exam, etc.) a chaperone is required." *Id.* The Chaperone Policy was not uniformly applied at Tripler, and it was unclear whether it was intended to apply to routine care such as is necessary when a patient has a catheter. However, the existence of the Chaperone Policy is undisputed.

38. Gary was not told of the policy, and there were no signs or other notifications of the policy available for him to see or read. Had Gary been told that a male nurse was going to be responsible for procedures involving Lacey's private areas, he would have remained with her or requested a chaperone during those procedures. Gary Panion Decl. ¶ 93.

39. According to Tripler, the policy "helps to ensure the environment of care provides reasonable assurance of propriety and privacy for the patient and protects our providers from unjust accusations of misconduct during patient interviews and examinations." Ex. 38. Nurse Lisa Peddle testified at trial that an additional purpose of the Chaperone Policy was to guard against sexual assault of patients.

40. There is no question that Tripler was very much aware of the risk that hospital staff would assault patients. Nurse Sharon Quigley, the head nurse for Ward 6C1 at Tripler,[4] said that she had heard of another sexual assault in Tripler's Intensive Care Unit by a male LPN who had assaulted a patient with a tube in her throat. Quigley Depo. at 89. According to the criminal investigation reports of that assault, the assailant was actually a male nurse's aide, not a male LPN. *See* Ex. 19 at 01716. The point is, however, that at least Quigley knew of a previous assault of an incapacitated patient by hospital staff.

41. The court is not here deciding that any failure to follow the Chaperone Policy was a violation of the medical standard of care in the community. A medical ethics expert for the United States, Dr. S.Y. Tan, explained that "there is no community or national ethical standard governing the use of chaperones in a hospital setting, and certainly none applicable in the ICU." Ex. 1 to Tan Decl. at 4. The court is instead finding that the Chaperone Policy simply highlights Tripler's awareness of the danger that hospital staff might assault patients entrusted to Tripler's care.

*Tripler's Failure to Reasonably Supervise Fellers*

42. As noted above, Dr. Moon has no recollection of having actually monitored Lacey closely throughout the night of March 11, 2001. The absence of records of such monitoring concerns the court because Dr. Moon knew that there was no clear diagnosis for Lacey. She was in and out of consciousness, and she had possibly been given a date-rape drug, for which no laboratory analysis was ever done. Dr. Moon was a brand new intern and so

4. Lacey was transferred to Ward 6C1 after she was released from the MICU.

should have been extra careful. Had he or anyone visited Lacey's room regularly that night, Fellers, as the nurse assigned to care for Lacey, would have realized that someone might walk in on whatever he was doing in Lacey's room. Fellers would then have felt more constrained.

43. Like Dr. Moon, Nerida, the super charge nurse during the night shift on March 11, 2001, paid little heed to Lacey. Nerida was responsible for supervising all four of Tripler's Intensive Care Units, including the MICU. Nerida Depo. at 22. These responsibilities included supervision of all staff on duty during the shift. *Id.* at 12. Nerida was also responsible for two "critical" patients during the shift. *Id.* at 24. Nerida herself was concerned that the MICU was understaffed that night and requested more staff to assist her. *Id.* at 20. She received no response to that request. *Id.*

44. The United States' nursing expert, Arthur Shumate, disagreed with Nerida's assessment of understaffing, noting that "[t]he national standard for critical care units is one nurse to every 2–3 patients depending on the acuity level of the patients." Shumate Decl. ¶ 4. He further noted, "It is not unreasonable or uncommon for a charge nurse to take a patient load." *Id.* But even if Tripler's staffing that night met the national standard for critical care units, that does not mean that the Tripler MICU was sufficiently staffed. Putting aside mere numbers, the status of the patients may have meant that the nurses on hand on the night shift of March 11, 2001, were not sufficient to meet the demands of the MICU that night. Nerida, the super charge nurse, felt strongly enough that the MICU was understaffed to request assistance.

45. Although Nerida had assigned Fellers to take care of Lacey, Nerida herself had the ultimate responsibility for Lacey's care during the night shift. *See* Quigley Depo. at 100. Nerida was supposed to review Fellers's assessment of Lacey, "double check" on how Fellers was caring for Lacey, and review his decisions regarding Lacey's care. *Id.* Nerida's responsibility to monitor Fellers was heightened by his inexperience, as Fellers had only recently completed his orientation period as a Tripler LPN.

46. It turns out, however, that Nerdia had minimal contact with Fellers over the course of the shift. At no point during the shift did she even ask about or discuss Lacey's condition with him. At 7:30 p.m. on March 11, 2001, Nerida saw Fellers speak to Lacey, who was intubated and appeared to Nerida to be sedated and drowsy. Nerida Depo. at 28. Nerida did not speak with either Fellers or Lacey at this time. *Id.* Nerida's next interaction with Fellers was about three and a half hours later, at around 11:00 p.m., when Nerida knocked on Lacey's closed door, entered the room, and asked Fellers to help her lift a patient. *Id.* at 28–29, 40–41. Nerida found Fellers rubbing lotion on Lacey's legs. Nerida could not tell whether Lacey was awake or not, *id.* at 32, so Lacey was apparently lying silent and unresponsive with her eyes closed. Nerida watched Fellers for approximately ten seconds without questioning him concerning his actions or about Lacey's condition. *Id.* Surprisingly, Nerida found nothing unusual about Fellers's application of lotion to the legs of a woman who may have been asleep or unconscious. *Id.* at 32.

47. Five hours later, Nerida went to Lacey's room again, but not to check on Lacey or on Fellers's care of Lacey. Instead, Nerida asked Fellers to "bring our lab down to the lab." *Id.* at 40. Nerida did not discuss Lacey's condition with Fellers for even an instant. Later, at 4:30 a.m., Nerida saw Fellers in the break

room, where she again did not discuss Lacey's condition. *Id.* at 40–42.

48. During the night shift that began on March 11, 2001, and ended on the morning of March 12, 2001, Nerida's interaction with Fellers was limited to these four brief encounters. Notwithstanding her responsibility for supervising Fellers's care of Lacey, Nerida did nothing except once check Lacey's medical chart. She did not review computer entries on Lacey's care, which would have included Fellers's updates on Lacey's care and condition during the shift. Nerida Depo. at 25. She did not even once discuss Lacey's condition with Fellers. *See id.* at 24–25. Nerida only glanced at Lacey's body for a few seconds at a time, without actually assessing Lacey's condition. At most, Nerida made the kind of observation a lay person could have made (i.e., noting that Lacey seemed drowsy or may have been asleep). Nerida did not make a nurse's assessment of Lacey.

49. The Panions' nursing expert, Laura Burchell–Henson, stated, "Simply put, there is no indication at all that Super Charge Nurse Nerida carried out her supervisory responsibilities in the ICU related to supervising, overseeing, questioning, correcting, guiding or disciplining the nursing care given to Mrs. Panion by LPN Fellers on 3/11/01 and 3/12/01." Expert Report of Laura Burchell–Henson, Ex. A to Burchell–Henson Decl. at 4. The United States' nursing experts, Arthur Shumate and Nancy Coppin, disagreed with this statement, contending that Nerida had made an assessment of Lacey's condition when she looked in for ten seconds as Fellers applied lotion to Lacey. *See* Ex.1 to Shumate Decl. ¶ 20; Ex. 1 to Coppin Decl.; Coppin cross-examination.

50. The court finds Burchell–Henson more persuasive on this point. Nerida's limited interaction with Fellers during the course of the night shift constituted nei-

ther adequate assessment of Lacey's condition nor reasonable supervision of Fellers. A reasonable and prudent supervisor would have expended some effort to monitor Fellers, check on Lacey's condition, and review what Fellers was doing. These responsibilities were especially important with a patient who was passing in and out of consciousness throughout the shift, and whose medical problems had yet to be clearly diagnosed.

51. Peddle testified that it was appropriate for Nerida to have only limited direct contact with Lacey, as Nerida could supervise and monitor Lacey's care by viewing Lacey's monitor outside the room and by speaking with Fellers. Peddle Decl.¶ 7. There is no evidence, however, that Nerida monitored Lacey's care in this way, or even once spoke to Fellers about Lacey's condition. Further, even if Nerida had spoken to Fellers about Lacey at any point, the court has significant concerns about Nerida's ability to communicate orally, as illustrated by her difficulties in answering questions during her deposition.

52. Particularly troubling to the court is Nerida's failure to intervene or at least question Fellers when she found him rubbing lotion on the legs of an unresponsive patient. There was no indication that such treatment was medically necessary or even appropriate.

53. As an initial matter, massage is rare in intensive care units because of the time constraints placed on nurses in that setting. *See* Burchell–Henson Decl. at 8. Even Shumate, the United States' nursing expert, testified during cross-examination that massage is "rarely seen" in hospitals. At Tripler, Fellers's actions were unusual enough that other nurses had previously called him "a good nurse" for applying lotion. Ex. 1. The court is at a loss to understand why these other nurses were not concerned or suspicious about another

nurse who routinely found time to apply lotion, while they themselves were too busy to do so. They should have realized that Fellers was either neglecting other duties that they were performing, or that he was too involved with touching patients. No one at Tripler should have thought that Fellers applied lotion as part of being a superstar of a nurse. This was someone who had had his orientation period extended twice. While hospital personnel went out of their way at trial to emphasize that orientation extensions were by no means unusual and did not reflect performance deficiencies, it goes without saying that extensions would not be needed for an employee whose performance was outstanding in all areas. Bells should have gone off about Fellers long before Lacey was assaulted.

54. The court certainly agrees with the United States that touch can be highly therapeutic. Touch can alleviate pain, give comfort to patients, and increase circulation. It can communicate concern and caring. But those benefits do not inure to a sleeping or unconscious patient. While sleeping or unconscious, Lacey could not have asked for or otherwise assented to any massage or lotion application.

55. Massage also may have been contraindicated by Lacey's condition. Burchell–Henson stated that tactile stimulation can precipitate seizure, and that this type of sensory stimulation should be minimized in patients with seizure disorders. Burchell–Henson Decl. at 9. Nerida knew of Lacey's seizurelike episodes, and accordingly should have known that massage might not be medically appropriate. The court is not here finding that massage was, indeed, contraindicated for Lacey, but the court does find that Fellers's massage should have been a red flag to Nerida because of the possibility that massage was contraindicated. Even without any contraindication, however, Nerida should have been concerned, for the reasons stated earlier.

56. The attitude displayed by Nerida and by other nurses to Fellers's lotion application on March 11, 2002, as well as on prior occasions, can best be described as one of notable inattention. This was a hospital with a Chaperone Policy that clearly recognized the possibility of impropriety by hospital staff. In fact, this was a hospital with at least one other sexual assault in its history. Still, no one questioned Fellers about the appropriateness of lotion, instead assuming that the application of lotion was insignificant or even beneficial. No one could have thought Fellers was applying lotion to alleviate any pain for Lacey, as she was, after all, giving no indication at the time of being in pain. Nor was Lacey's skin breaking down. Her Braden Assessment score was 18, indicating that she was not at risk for skin problems. *See* Ex. 11 at 0072–74. Skin assessments were performed on Lacey six more times during her stay in the MICU, with each of the reports indicating "skin warm/dry to touch, no signs of skin breakdown." *Id.* at 0055, 57, 60, 62 64, 67. Indeed, as Lacey had been in the hospital for only about twenty-four hours, it was unlikely that skin problems or bed sores had already developed or were at great risk of developing at the time.

57. A reasonable and prudent supervisor would have intervened upon seeing Fellers rub lotion on Lacey's legs while she was sleeping or unconscious, particularly given the foreseeable risk of sexual assault on patients. Both Moon and Quigley stated that, if they had found a nurse giving a massage to a patient, they would have asked the nurse about the purpose of the massage. Moon cross-examination; Quigley Depo. at 91.

58. Nerida, however, did nothing. She did not stop him. She did not even ques-

tion him. She stood and let him continue. Then she left him alone with Lacey, behind a closed door. This was a failure to reasonably supervise Fellers.

59. All of the MICU staff should have been concerned that a patient's door was closed for hours with the blinds drawn. Even if they did not suspect a sexual assault was occurring behind closed doors, they should have checked to make sure that the nurse in that room was indeed providing appropriate care and not, for example, himself sleeping. Coppin states that closing doors of hospital rooms helps to reduce noise and light from the hallways and common areas of the hospital. Ex. 1 to Coppin Decl. at 3. Peddle similarly stated that the blinds might be shut to reduce light.[5] Peddle Decl. ¶ 9. Given Lacey's condition, however, it was important to keep the door open so that help could be easily summoned if needed and so that Lacey could be seen by those outside the room if the nurse was not in the room. *See* Burchell–Henson Decl. at 18. Significantly, the door to Lacey's room was only closed once during her stay at the MICU, and that was during the five-hour period that included the assault.

60. Tripler's inattention to Lacey and its failure to provide reasonable supervision was a substantial factor in Fellers's sexual assault of Lacey. Fellers committed the assault during a period in which he was unsupervised in Lacey's room for five hours. Dr. Moon's and Nerida's failure to check on either Fellers or Lacey during this lengthy period created the opportunity for the sexual assault. Lacey reported that, as he assaulted her, Fellers did exhibit some concern that he might be interrupted or discovered. *See* Lacey Panion Decl. ¶ 45. This suggests that, had Fellers

thought it likely someone would be checking on him, he would not have felt sufficiently free to conduct the assault. Any concern he had certainly did not spring from actually having had much supervision that night.

61. To the contrary, Fellers knew that no one suspected anything nefarious about his application of lotion to Lacey's legs. He knew that because others had praised his application of lotion to patients or stood silent while watching him apply lotion. Not only was he unsupervised and unmonitored, he could unnecessarily touch Lacey with impunity and, if caught, knew that others would think only that he was providing good nursing care! Fellers admitted to having engaged in sexual acts with another patient at Tripler three years earlier. He was not caught then, and his decision to repeat this behavior demonstrates his confidence that he would not be caught this time.

62. Tripler breached its duty to Lacey. In spite of realizing that hospital staff might sexually assault patients, as evidenced by its Chaperone Policy, and in spite of having had an earlier such assault on its premises, Tripler heard no warning bells when Lacey's door and blinds were closed for hours while she was alone with a nurse who was known for somehow finding time to rub lotion on patients and who had been seen rubbing lotion on Lacey's legs as she slept or was unconscious. In spite of knowing that Lacey was sedated and passing in and out of consciousness, and in spite of knowing that there was no clear diagnosis of her and that she might have been given a date-rape drug, Tripler did not think it important to monitor her and her newly oriented caregiver regularly and

5. From Lacey's testimony that she could see shapes through the blinds, Lacey Panion Decl. ¶ 49, it is clear that the blinds did not completely block the view from the inside of the room. The blinds did, however, provide the room with significant privacy. *See* Peddle Decl. ¶ 9.

carefully. Dr. Moon even assured Gary that he could go home, although Gary was prepared to and wanted to spend the night watching over Lacey in her hospital room. While the discussion above focuses on Nerida, the court stresses that the MICU as a whole failed Lacey.

### Compensatory Damages

63. The sexual assault was a terrifying and painful experience for Lacey. Lacey suffered pain when Fellers digitally penetrated her vagina while she was catheterized. But the overwhelming injury was the fear, disgust, and emotional trauma she has suffered. Unable to move, scream, or fight back, Lacey endured what one normally thinks of as the stuff only of nightmares. In her helpless state, she was assaulted by the very person assigned to care for her, all the while knowing that help was close at hand but unattainable because she could not summon anyone. Her revulsion, terror, and frustration has far outlasted what seemed to Lacey to be an interminable assault.

64. According to Bobbie Licht, Lacey's mother, the sexual assault has changed Lacey. Licht Decl. ¶¶ 31, 36. Immediately after the assault, Lacey would not sleep or eat. *Id.* ¶ 21. Lacey became distant from her sons and would not show them any physical affection. *Id.* at 23. To this day, Lacey remains distrustful of others and angry. *Id.* at 31. She frequently cries and is easily frightened. *Id.* at 29. Physical contact is difficult for her, and she is often startled or frightened when Gary or other family members touch her. Gary Panion Decl. ¶ 153. What had been the Panions' healthy sexual relationship before the assault degenerated, and they had no sex during the year following the assault. *Id.* Their intimate contact has been minimal since then. *Id.* ¶ 164; Lacey Panion cross-examination.

65. Lacey continues to struggle with the emotional damage caused by the assault. Because she was having difficulty sleeping, she is taking Ambien. She also received the antidepressant Laxapro. Lacey Panion Decl. ¶¶ 103, 104.

66. Having examined Lacey, Dr. Claude Chemtob, a psychologist who specializes in post-traumatic stress disorder ("PTSD"), opined that Lacey has suffered extreme emotional distress, and he diagnosed her with PTSD. *See* Ex. 54 at 4. Dr. Chemtob found that Lacey meets the criteria for a diagnosis of Major Depression. *Id.* He noted that Lacey has reported a depressed mood, a loss of energy, and diminished interest and pleasure. The symptoms Lacey reports "are clinically significant and have interfered with her ability to perform her role as a wife and as a parent." *Id.* Dr. Chemtob noted Lacey's "recurrent intrusive recollections of the sexual abuse," including disturbing dreams related to her trauma. Lacey's PTSD symptoms are "severe," and the symptoms "cause her significant daily distress." Dr. Chemtob anticipates that Lacey will need significant counseling, from both a therapist and a social worker. *Id.*

67. The sexual assault has also greatly affected the Panions' marriage. Before the assault, the marriage was stable and loving, albeit not without occasional conflict. Gary Panion Decl. ¶ 27; Lacey Panion Decl. ¶ 11. Since the assault, Lacey has had difficulty trusting Gary, and their relationship "has gone downhill." Lacey Panion Decl. ¶ 105.

68. Gary and Lacey readily admitted that, early in their marriage, Gary had an extramarital affair. Smith Decl. ¶ 2. It lasted a single evening, after which they discussed it with each other and reconciled. Since that time, they had enjoyed a stable and happy relationship until the sexual assault. Gary and Lacey denied more recent infidelity problems. Lela Smith, a neighbor whose children Lacey had baby-

sat, recalled that, in 2000, Lacey had once mentioned that Gary had had an affair. Smith also recalled that, in January 2001, at a farewell party for Smith's family, Lacey reported that, the day before the party, a woman with whom Gary had had an affair had called the Panions' home, causing Lacey and Gary to argue. *Id.* ¶ 4. Gary and Lacey denied that such a telephone call occurred.

69. Smith's testimony does not diminish the court's evaluation of the Panions' damages. In the first place, even if the call occurred as reported by Smith, it does not affect the court's view of the relationship Gary and Lacey enjoyed when the assault occurred in March 2001. At most, the Panions had exchanged words when an old wound was reopened by an apparently uninvited phone call. There is no evidence that the phone call had any impact on their relationship weeks later, when Lacey was assaulted. In the second place, the court is unpersuaded that the call occurred as reported by Smith. On the witness stand, Smith seemed remarkably willing to speak about something she had to know would work against the Panions. She did not seem even a little reluctant to divulge intimate details about a person who had been a neighbor, friend, and confidant. While a witness who testifies truthfully need have no hesitation, Smith seemed to the court to be unnervingly comfortable helping the United States defend itself against Smith's former friends.

70. Smith readily admitted that the United States had paid for her trip to Hawaii. Smith also testified that the United States, in its initial contacts with her, had indicated its interest in finding evidence of marital problems between Gary and Lacey. The United States had also told Smith that Lacey may have had a consensual sexual encounter with Fellers![6] These circumstances may well have colored Smith's recollection of events, as well as her attitude toward Lacey.

71. The court finds that, at the time of the sexual assault, the Panions had a strong and loving marriage. After the assault, however, the Panions have struggled with the effects of the assault on Lacey, her loss of trust in Gary, and her inability to be intimate with him. Lacey has suffered, and her suffering has caused Gary loss of consortium.

72. Focusing on the future, Dr. Chemtob noted that the Panions' marriage might not survive the strains caused by the sexual assault. Ex. 54 at 9. In that event, Dr. Chemtob noted, Lacey would lose both the financial and emotional support of her husband at a time when both would be sorely needed. Accordingly, Dr. Chemtob recommends marital counseling for the Panions. *Id.* at 10.

73. Dr. Chemtob estimates that Lacey needs sixty hours of treatment from a social worker at a cost of $9,000, four hundred hours of treatment with a senior therapist at a cost of $80,000, one hundred twenty hours of marital counseling at a cost of $21,000, and twenty-four hours of treatment with a trauma consultant at a cost of $6,000. *See* Ex. 55. Because Lacey is distrustful of Tripler, she will need to receive medical care outside of the military health system. The court finds Dr. Chemtob's estimate of $116,000.00 reason-

6. This "blame the victim" approach was consistent with Tripler's earlier assumption that Lacey had collapsed because she had had too much to drink and with Dr. Moon's suspicion that Lacey was angling to get drugs for non-medical reasons. After the assault, Lacey and Gary complained that they were not treated respectfully. Although the court considered Ashley's approach to the report of the assault to have been sympathetic and appropriate, disrespectful treatment by one or more other federal employees would have been in line with the general "blame the victim" attitude displayed to the Panions.

able and appropriate, given the serious emotional difficulties that Lacey must still overcome.

74. The court turns now to Lacey's general damages. This is a very difficult matter to determine for the court. The court was aided in its determination by the Panions' presentation of a very strong damage case, bolstered by detailed and trustworthy evidence. The United States, by contrast, barely touched the damage issue, apparently confident that it would defeat any liability claim.

75. Besides relying on the evidence set forth above, the court was influenced by such intangibles as the Panions' body language and demeanor during the trial. It appeared to the court that Gary and Lacey are both clearly in great distress. The court came away from the trial with the distinct impression that they are no longer comfortable with each other.

76. The court values Lacey's general damages at $700,000.00. This amount reflects five elements:

a. It attempts to reflect the unimaginable pain, terror, revulsion, frustration, and emotional trauma that Lacey had to endure during the nightmarish extended sexual assault. This element alone is worth hundreds of thousands of dollars.

b. It also includes the debilitating effects in the four years since the assault, another element worth hundreds of thousands of dollars. During this period, Lacey has operated without any zest for life, having lost all interest in her family or in the world around her, while experiencing recurrent fear, grief, and horror. She has considered suicide. She has no interest in physical contact with her husband. She is distant from her children and is missing much of the joy of raising her sons. She cries constantly. Turning away from people, she has gained more than thirty pounds as she turns instead to food. Lacey Panion Decl. ¶ 98. She has not found a therapist with whom she feels comfortable and so has not had the benefit of all the counseling she requires. While, under different circumstances, a failure to participate in a full regimen of counseling might mitigate the damages a claimant could justify, the court notes that, in this case, Lacey developed an understandable mistrust of medical personnel after she was assaulted in a hospital by a nurse.

c. The damage amount reflects the reality that the debilitating period is far from over, as Dr. Chemtob estimates that Lacey needs two years or so of therapy. Ex. 55. Thus, it will be more than six years from the assault, even under optimistic predictions, that Lacey will in essence be drowning in the effects of the assault.

d. The damage amount also reflects the possibility that Lacey will never return to her old self and that her marriage is irreparably damaged or destroyed.

e. Finally, the damage amount recognizes that, whether or not treatment helps Lacey, she will live the rest of her life affected by the assault.

77. Gary has also suffered. The court awards him $90,000.00 for the past four years of loss of consortium and for his losses for at least the next two years, during which Lacey requires treatment.

78. To summarize, the court awards a total of $906,000.00 in compensatory damages ($116,000.00 to Lacey in special damages, $700,000.00 to Lacey in general damages, and $90,000.00 to Gary in general damages).

## IV. CONCLUSIONS OF LAW.

1. Under the FTCA, the United States is liable only in the manner and to the extent that a private individual could be held liable under similar circumstances. See 28 U.S.C. § 2674. In this action, the

United States is liable in the manner and to the extent that a private hospital would be subject to suit.

■ 2. Liability under the FTCA is determined under the law of the state where the act or omission occurred. 28 U.S.C. § 1346(b)(1); *Will v. United States,* 60 F.3d 656, 659 (9th Cir.1995). Because the tortious conduct alleged in this case occurred at Tripler, the court applies Hawaii law. *See P.K. Bush,* 927 F.2d at 447.

3. The Panions seek recovery under medical negligence, negligent supervision, and general negligence theories. In claiming medical negligence, the Panions contend that doctors and nurses at Tripler violated applicable standards of medical care in treating Lacey and thereby were a cause of the sexual assault. In claiming negligent supervision, the Panions argue that Tripler failed to adequately supervise Fellers, allowing him to assault Lacey. Both the medical negligence and the negligent supervision claims are subsumed by the Panions' general negligence claim, which asserts that the United States breached its duty to protect Lacey from foreseeable injury. This general negligence claim is based on the United States' special duty to Lacey.

■ 4. Under Hawaii law, there are four primary elements to a negligence claim. A plaintiff must establish by a preponderance of the evidence: (1) the existence of a duty or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks; (2) a breach of the duty; (3) a reasonably close causal connection between the breach and the resulting injury to the plaintiff; and (4) actual loss or damage suffered by the plaintiff. *See Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawai'i 398, 419, 992 P.2d 93, 114 (2000).

*The United States' Special Duty To Protect Lacey From Foreseeable Harm*

■ 5. As a general matter, "a person does not have a duty to act affirmatively to protect another person from harm by a third person." *Doe v. Hawaii,* 100 Hawai'i 34, 71, 58 P.3d 545, 582 (2002); *Lee v. Corregedore,* 83 Hawai'i 154, 159, 925 P.2d 324, 329 (1996). There are, however, circumstances that warrant the imposition of a special duty to protect others from foreseeable harm by a third party. *See Doe,* 100 Hawai'i at 34, 58 P.3d at 582. "If, for example, there is a 'special relationship' between the defendant and the plaintiff, or between the defendant and a third person, then the defendant owes the plaintiff a 'duty to control the conduct of the third person so as to prevent him or her from causing physical harm to the plaintiff.'" *Id.* The existence of such a "special duty" is entirely a question of law. *Ruf v. Honolulu Police Dept.,* 89 Hawai'i 315, 320, 972 P.2d 1081, 1086 (1999).

■ 6. Citing the Restatement (Second) of Torts § 314A at 118 (1965), the Hawaii Supreme Court has recognized a "special relationship" giving rise to a duty to protect when a party "takes the custody of another under circumstances to deprive the other of his normal opportunities for protection." *Lee v. Corregedore,* 83 Hawai'i 154, 159, 925 P.2d 324, 329 (1996); *see also Doe,* 100 Hawai'i at 71, 58 P.3d at 582 (listing the special relationships identified by § 314A of the Restatement (Second)). "The 'section 314A list' is not ... exhaustive, and other circumstances may engender a 'special relationship.'" *Doe,* 100 Hawai'i at 71, 58 P.3d at 582. Examples of these "other circumstances" include the relationship between a state and a prisoner, as well as the relationship between a counselor and a student. *See Lee v. Corregedore,* 83 Hawai'i at 161, 925 P.2d at

331 (citing other states' recognition of special relationships in those situations).

7. The United States had a special relationship with Lacey given Lacey's status as a patient at Tripler. Tripler assumed a custodial role by admitting Lacey to the hospital and the MICU, and further contributed to the deprivation of her normal protections through the administration of drugs it knew were sedatives.

8. Through the creation of this special relationship, Tripler assumed a duty to protect Lacey from foreseeable harm by exercising reasonable care. The special duty was further enhanced by Tripler's knowledge that Lacey was passing in and out of consciousness. *See Bembenista v. United States*, 866 F.2d 493 (D.C.Cir.1989) (hospital had "special duty" to protect a comatose or semi-comatose patient against foreseeable harm).

### Breach of the Special Duty To Protect Lacey

9. A defendant breaches a special duty to protect a plaintiff if the defendant fails to do "what a reasonable and prudent person would have done under the circumstances." *See Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 386, 742 P.2d 377, 383 (1987). "However, the conduct of the mythical reasonable and prudent person will vary with the situation with which he or she is confronted because what is reasonable and prudent in the particular circumstances is marked out by the foreseeable range of danger." *Doe*, 100 Hawai'i at 82, 58 P.3d at 593 (internal citations omitted). The law thus requires greater diligence in the face of greater danger. *Id.*

10. Whether or not a defendant has breached a special duty to protect the plaintiff from harm is a question for the trier of fact. *Knodle*, 69 Haw. at 386, 742 P.2d at 383. As noted above in this court's findings of fact, the United States failed to adequately supervise Fellers during the night shift of March 11, 2001.

11. Tripler was well aware of the danger of sexual assault by hospital staff on a patient, as evidenced by its adoption of the Chaperone Policy. It knew of at least one earlier assault at its own facility by hospital staff of a patient. Even more important than that history is Nerida's discovery of Fellers as he rubbed lotion on Lacey's legs while Lacey slept or was unresponsive, and the knowledge other nurses had that Fellers somehow found time to routinely apply lotion to patients, while other nurses were too occupied by other tasks to do so. It was foreseeable to Tripler that Fellers would harm a vulnerable Lacey.

12. The United States breached the special duty it owed Lacey to protect her from foreseeable harm.

### Legal Causation

13. "An actor's negligent conduct is a legal cause of harm to another if (a) his or her conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his or her negligence has resulted in the harm." *Doe*, 100 Hawai'i at 85, 58 P.3d at 596 (citing *Taylor–Rice v. State*, 91 Hawai'i 60, 74, 979 P.2d 1086, 1100 (1999)). The first prong of this test "contemplates a factual determination that the negligence of the defendant was more likely than not a substantial factor in bringing about the result complained of." *Taylor–Rice*, 91 Hawai'i at 74, 979 P.2d at 1100. Under this test, "a defendant's negligence need not have been the whole cause or the only factor in bringing about the harm. It was enough that his or her negligence was a substantial factor in causing plaintiff's injuries." *Id.* As the United States does not contend that any rule of law relieves it

from liability, only the first prong of the inquiry is relevant in this case.

14. Tripler's failure to reasonably supervise Fellers gave him the opportunity and sufficient freedom from fear of discovery to assault Lacey. The failure to reasonably supervise was therefore a substantial factor in his sexual assault of Lacey.

15. This failure was exacerbated by Dr. Moon's assurances to Gary, which caused him to leave Lacey alone with Fellers on March 11, 2001.

### Actual Damages

16. As noted above in this court's findings of fact, the Panions have suffered significant physical and emotional damages as a result of the sexual assault.

## V. ORDER.

The United States failed to exercise reasonable care to protect Lacey Panion from the foreseeable risk of sexual assault, and Lacey and Gary Panion suffered damages as a result. The court awards $816,000.00 in favor of Lacey Panion and $90,000.00 in favor of Gary Panion, for a total award to Plaintiffs of $906,000.00.

The Clerk of Court is directed to enter judgment accordingly and to close the file in this case.

IT IS SO ORDERED.